# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| EUGENE SCALIA, Secretary of Labor,<br>United States Department of Labor, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No.3:19-cv-00700 |
| EM PROTECTIVE SERVICES LLC and<br>ERIK MAASIKAS, | ) ) ) | JUDGE CAMPBELL<br>MAGISTRATE JUDGE<br>NEWBERN |
| Defendants. | ) | |

---

## MEMORANDUM OF LAW

---

Defendants have separately moved for Summary Judgment on <u>all</u> issues **[Doc. 37]**. The following Memorandum of Law is in support of that Motion**.**

As used herein,

- The Defendant, **EM Protective Services, LLC**, shall be referred to as "EM," and

- The Defendant, **Erik Maasikas**, shall be referred to Mr. Maasikas.[1]

---

[1]     Mr. Maasikas is the owner of EM. He was named as an individual party pursuant to the provisions of 29 U.S.C. §203(d).

## <u>SUMMARY OF THE CASE</u>

This is a claim by Plaintiff to recover $350,849.22 in overtime pay and other relief. It arises from a dispute as to whether EM's workers were employees or independent contractors. It involves 105 workers.

EM provides security services for two types of projects:

- Disaster relief throughout the United States (following hurricanes and tornadoes); and
- Traffic control (mostly local).

EM does not have regular or daily operations. Instead, it provides security services on an as-needed (project-by-project) basis. EM historically uses individuals who are off-duty police, ex-police and/or ex-military seeking to obtain additional income.

In this case, Plaintiff contends that 105 individuals that EM used since November, 2017, should have been classified as employees. Hence, Plaintiff asserts the following claims:

1. That EM be restrained from such future activities;
2. That EM pay funds for back-pay (overtime); and,
3. That EM pay liquidated damages.

### <u>Disaster Relief</u>

As noted, EM performs two types of work, one of which is disaster relief. The worker complaint that gave rise to this lawsuit concerns a disaster relief project following a hurricane in Puerto Rico in the fall of 2017.

The Plaintiff relies upon the complaints of 1 of the 105 workers who provided disaster work for EM, in Puerto Rico. However, and as will be shown, the testimony of that sole worker actually supports Defendants' defense. None of the other 104 workers lodged a complaint. To try and salvage its claims, Plaintiff then subpoenaed and deposed 6 of the other 105 men. Those 6 workers also worked for EM on a Puerto Rico hurricane project. None of those 6 workers helped

Plaintiff's proof. Each of those men has unequivocally testified:

- That they have worked for EM on a project-by-project basis, by agreement, as independent contractors;
- That they work for <u>other</u> companies, as well, as independent contractors;
- That they work with autonomy;
- That they prefer to work as independent contractors; and,
- That EM owes none of them additional compensation.

Simply stated, Plaintiff procured no favorable testimony from the 6 workers it chose to depose. And, it elected not to depose any of the other 99 workers. Thus, and in support of its Motion, EM relies on those seven (7) depositions.[2]

## **Traffic Control**

The other type of work that EM provides is security services and traffic flaggers for traffic control projects (construction projects, etc.). As noted, Plaintiff seeks to have this Court re-classify 105 of EM's workers. Dozens of those workers have worked for EM for traffic control projects. However, Plaintiff did not depose or obtain an affidavit from <u>any</u> of EM's workers concerning the traffic control aspect of Plaintiff's claim. Instead, Plaintiff deposed a small handful of individuals who worked on the disaster relief project in Puerto Rico. Plaintiff apparently hopes that this Court will then extrapolate that evidence for each of the 105 workers, including those who work only on local, traffic control projects.

In addition to the helpful testimony of those 7 individuals referenced above, EM <u>also</u> relies upon sworn affidavits of other individuals who have periodically worked for EM on traffic control projects. As will be shown, the sworn testimony of those Affiants is consistent with the deposition testimony of the above-referenced deponents. The record is void of contrary evidence.

---

[2] These are the depositions of the Complainant, who was deposed by Defendants, and 6 others, who were deposed by Plaintiff.

**THE FACTS**

The facts set forth below are taken from EM's separate *Statement of Uncontested Facts*, which is filed contemporaneously with this Memorandum. That *Statement of Uncontested Facts* has specific citations to evidence, including: **(a)** references to seven (7) deposition transcripts, and **(b)** references to four (4) sworn Affidavits. The specific citations to that evidence are set forth in the *Statement of Uncontested Facts* (filed contemporaneously herewith).

**The Nature of EM's Business**

EM was formed in 2010 by Mr. Maasikas. It is licensed as a Security Company by the Tennessee Department of Commerce and Insurance. EM is owned by the Defendant, Mr. Maasikas, who draws compensation from EM's profits. Its Chief Operating Officer, William Guthoerl, manages the business and receives compensation, plus incentives.

EM provides traffic control and disaster relief (following hurricanes and tornadoes).

Because of the nature of EM's work, it does not (and cannot) have regular or daily operations. Instead, it has relationships with state and federal agencies and when asked, on a disaster-by-disaster basis, it provides armed security detachments in the havoc that follows weather-related disasters. Thus, the disaster relief work may occur 1-2 times per year, or perhaps more (but not with regularity or predictability).

EM's traffic control work is equally sporadic. It is provided to public agencies, such as the Department of Transportation, city governments, and construction companies (that provide services which require traffic control for safety, deterrent, etc.).

**Traffic Control**

Approximately 50% of EM's work relates to traffic projects (*i.e.,* a construction zone, etc.). These types of jobs are not fixed or on-going. Instead, the hiring party contacts EM on a project-

by-project basis.  Depending upon the requirements of the client, EM brokers with armed security guards or unarmed security guards.[3]  Thus, in order to be eligible for such an assignment, the worker must have a license, issued by the State of Tennessee (or other state), as either an Armed Security Guard or an Unarmed Security Guard.  Depending on the client's demands, the worker may also be required to have a license from the State of Tennessee as a Traffic Flagger.

Most of the individuals who carry these types of credentials are either ex-military, active police officers (looking to make money on their days off), or ex-police officers (looking to supplement their retirement).

**Compensation to Workers for Traffic Control Work**

Industry standards are that individuals are compensated at a minimum equivalent of 4 hours.  If an individual works 30 minutes, which may be common for traffic-related work, they are still paid for 4 hours at the minimum hourly rate.  Because of this, time reporting always reflects a minimum of 4 hours.  In addition, time is rounded to the next half-hour.  Thus, if a contractor works 4 hours and 10 minutes, they would be compensated for 4 hours and 30 minutes.  This is significant because the time accountability system used by EM was not developed to report the actual termination time of the individuals' services, but, rather the time for which the individuals are compensated.

**Disaster Relief Projects**

Approximately 50% of EM's work relates to disaster relief.  EM has been retained on a project-by-project basis by governmental agencies including **FEMA** and its state equivalent, as well as the Department of Homeland Security.  On these situations, EM brokers with individuals who want to work outside of the state (and on one occasion, outside of the Domestic United States,

---

[3] Different clients have different requirements.

in Puerto Rico) for a tenure which may be as short as 1 week or several weeks.

One such project concerned disaster relief provided in Puerto Rico, during a state of emergency, following a hurricane in late 2017. That Puerto Rico project is the bulk of the Plaintiff's claims in this case.

**The Puerto Rico Project**

The Federal Government, through *FEMA*, the Department of Homeland Security, the National Guard, and other agencies, was focused on securing damaged cell phone towers for purposes of drug interdiction services, communication services, and the like.

- The U.S. Government then retained T-Mobile to perform those services.
- T-Mobile then sub-contracted with a California company called Picore.
- Picore then sub-contracted with a Texas company called U.S.A.I.
- U.S.A.I. then contracted with EM to provide the manpower.

The Puerto Rican Government then issued a **Letter of Authorization** for security personnel including T-Mobile Puerto Rico, LLC. That authorization stated as follows:

> *Pursuant to the state of emergency in Puerto Rico after Hurricane Maria, I Hector M. Pesquera, Secretary of Public Safety of the Commonwealth of Puerto Rico, do hereby authorize T-Mobile Puerto Rico, LLC . . . to bring from the mainland security personnel to address the security situations...* (Emphasis added.)

In like manner, the Department of Homeland Security issued a **Directive** stating as follows:

> *The Department of Homeland Security (DHS), National Cybersecurity & Communications Integration Center (NCCIC), National Coordinating Center (NCC) is monitoring communication conditions related to: Hurricane Maria-FEMA Region II.*
>
> *The NCC Watch is prepared to coordinate between communication companies, debris removal teams, restoration and recovery crews.* (Emphasis added.)

EM then asked approximately 10 individuals with whom it had relations to solicit a team of individuals from across the U.S. to provide boots on the ground in Puerto Rico to assist T-Mobile's work for the government.

This type of work involves a cottage industry of individuals including ex-military, ex-police and other law enforcement-type individuals who carry various licenses, including armed security licenses, weapon carrying permits, and the like. These individuals are part of a national network of individuals throughout the United States that perform these services for companies such as EM, and <u>always</u> as independent contractors.

As noted, EM contacted approximately 10 individuals. <u>Those individuals</u> then recruited an additional 30-40 individuals from across the U.S. to fulfill T-Mobile's needs.

That group of 40-50 then travelled to Puerto Rico from various states and remained in Puerto Rico for approximately 8 weeks, with security badges issued by the Government.

The contractual terms between EM and each worker was identical. The contractual terms were as follows:

1. Military or law enforcement experience required.
2. A State-issued Armed Security License required.
3. A Weapon Carrying Permit required.
4. Free housing.
5. Free travel, if committed to stay at least 30 days.
6. Free food.
7. $400 daily rate, even on off days.[4]

**The Genesis of This Dispute**

All of the Puerto Rico team agreed to the terms extended by EM, <u>including</u> the man who later lodged the complaint that gave rise to Plaintiff's lawsuit. Each of those individuals then travelled to Puerto Rico, remained there for several weeks, were fully paid (including the daily rate on off days), and were completely satisfied with the terms of their engagement and the related compensation.

---

[4]     Two (2) individuals were paid the higher rate of $550 per day to assume larger – coordination roles.

The only exception concerns an individual named Hector Gonzales.

Although EM was unaware, Mr. Gonzales had relatives in Puerto Rico. He then left his security post on the island without advance notice, socialized with relatives and then departed the island after only a few days. This caused a security breach. EM then had to pay the cost to transport a replacement worker from the domestic United States. EM then paid Mr. Gonzales for his days worked, less the expenses incurred by EM as a result of Mr. Gonzales going AWOL. Those expenses included $2,000 for substitute airfare and related incidental and consequential damages.

Mr. Gonzales then filed a Complaint with the Department of Labor, which resulted in the initiation of its investigation; and, thereafter, this lawsuit. Plaintiff contends that Mr. Gonzales is due another $1,427.67. The remaining Puerto Rico workers (and all of EM's Domestic U.S. workers) are completely satisfied with the terms of their engagements <u>and have consistently testified that those terms were consistent with the manner in which they worked on prior assignments (for **other** companies) and on subsequent assignments (for **other** companies)</u>.

Ironically, Mr. Gonzales testified under oath that he did not report any of his Puerto Rican income to the Internal Revenue Service. He then refused to answer further questions concerning his failure to report that income, but without asserting any 5th Amendment Rights against Incrimination.

Plaintiff's case rests on the one witness, Hector Gonzales.

**The Testimony of the Other Puerto Rico Workers**

Aside from the lone complainant (Mr. Gonzales) the Plaintiff deposed 6 other individuals who were involved in the Puerto Rico project. Each of those individuals, including Mr. Gonzales, testified that:

- They agreed to work as independent contractors,

- They had historically worked as independent contractors for other companies, and
- They continue to work as independent contractors for various companies (separate and distinct from EM).

They each also testified that they provided their own equipment (weaponry, security equipment, safety equipment, etc.), and worked with autonomy. They also paid for their own business insurance and taxes.[5]

Plaintiff <u>did not</u> depose or procure any additional testimony from the remaining 40+ individuals who worked in Puerto Rico or <u>any of the other workers that are in the pool of 105 men</u> that Plaintiff seeks to re-classify. Of note, Plaintiff <u>did not</u> obtain any testimony from any individual who has historically worked for EM (locally) on traffic control projects. Yet, Plaintiff seeks to reclassify all of those workers, as well.

Thus, and to get to the bottom of the facts, EM interviewed a sampling of those additional workers, some of which were involved in the Puerto Rico project and some of which have worked for EM, locally, on traffic projects. Like the 7 deponents, <u>each of these Affiants consistently stated</u>, under oath, that they agreed to work as independent contractors, that they have historically worked as independent contractors (for other companies), and that they continue to work for other companies as independent contractors. They universally stated that they prefer this arrangement because it gives them the discretion to accept jobs (when they need to pick up extra income), to reject jobs that they don't wish to handle, and to exercise autonomy as to how they perform their services.

---

[5]     Mr. Gonzales chose to hide his income from the IRS.

## BASIS FOR SUMMARY JUDGMENT

As will be shown, the totality of the evidence (*i.e,* the 7 deponents and the 4 Affiants), establishes that EM correctly classified its workers as independent contractors rather than employees. Plaintiff has no evidence to the contrary and, therefore, it has failed to carry its burden of proof.

## SUMMARY OF THE EVIDENCE

Only 1 of the individuals that Plaintiff deposed resides in Tennessee. Thus, it appears that at trial Plaintiff hopes to read to the Court excerpts from witness depositions in its effort to convince this Court that all of EM's 105 workers should be reclassified as employees.

EM has summarized below those 7 depositions (*i.e.,* the 6 witnesses Plaintiff deposed and also, Defendants' deposition of Mr. Gonzales). EM also summarizes sworn Affidavits from other individuals. Thus, all of the testimony (through depositions and Affidavits) is before this Court. A summation of all of that evidence is as follows:

### Deposition Witness:  Hector Gonzales

Mr. Gonzales is the sole complainant. Defendants deposed him. He resides in Florida and had no prior connections with EM, save for being asked by a third-party to provide services, as an independent contractor, on the Puerto Rico Disaster Relief Project. Mr. Gonzales had previously worked for 14 years for another company as an independent contractor. When he agreed to work for EM, he agreed to do so, **in like manner**, as an independent contractor, paying his own taxes, etc. Excerpts from his testimony are as follows:

> *Q:*     *You had worked as an independent contractor for this other company since 2004.*
> *A:*     *Yes.*
> *Q:*     *And what is the name of that company?*
> *A:*     *The Brantly Corporation.*
> *Q:*     *Does that company issue to you on an annual basis a 1099 Statement?*
> *A:*     *Yes.*

Q:     In the fall of 2017, when Hurricane Maria his Puerto Rico, were you still working as an independent contractor for Brantly Corporation?

A:     <u>Yes</u>.

[Gonzales Depo., p. 10/17-20]

Q:     Did you seek full-time future employment with EM Protective Services?  Or, was it just limited to a particular project?

A:     Just limited to [that Puerto Rican] project.

Q:     And did you seek to handle that project as a W-2 employee or as an independent contractor?

A:     <u>I was assuming independent contractor</u>.

[Gonzales Depo., p. 12/18 – 13/2]

Q:     Prior to performing any services in Puerto Rico in the fall of 2017 for the Defendants, did <u>you agree to provide your services as an independent contractor</u>?

A:     <u>Yes</u>.

Q:     And at that time, you had at least 13 years' experience working as an independent contractor for Brantly Corporation?  Isn't that correct?

A:     <u>Correct</u>.

Q:     And during those prior 13 years from 2004-2017, did Brantly Corporation issue to you, annually, a 1099 tax form?

A:     Yes.

[Gonzales Depo., p. 13/6-18]

Q:     When you went to work for EM Protective Services in the fall of 2017, <u>you, in like manner, agreed to perform those services as an independent contractor, correct</u>?

A:     <u>Correct</u>.

[Gonzales Depo., p. 17/10-16]

Q:     How many days were you in San Juan from arrival to departure?

A:     It was about 20 days.

Q:     At any time during those 20 days, did you request to be converted from an independent contractor to a W-2 employee?

A:     No.

Q:     Was the security work that you did in Puerto Rico in 2017 for EM Protective Services substantially similar to the security work you had done for Brantly Corporation?

A:     <u>Yes</u>.

[Gonzales Depo., p. 18/8-16]

Q:     So you went [to Puerto Rico] knowing you were going as an independent contractor, right?

A:     <u>Yes</u>.

Q:     Right?

A:     <u>Yes</u>.

Q:     And you knew what that was because you had worked in security for another agency as an

-11-

> independent contractor for over 10 years, right?
>
> A:    *Correct*.

**[Gonzales Depo., p. 32/22 – 33/5]**

> Q:    *So the agreement between you and EM Protective Services was that you would remain there for the period in which they required your services, right?*
>
> A:    *Correct.*
>
> Q:    *You terminated your independent contractor relationship.*
>
> A:    *Correct.*
>
> Q:    *And went to visit your relatives and then stayed with your relatives?*
>
> A:    *Yes, sir.*

**[Gonzales Depo., p. 19/19 – 20/15]**

> Q:    *So when you went there, you agreed to stay for the duration of the project, but you unilaterally elected to terminate after 20 days, correct?*
>
> A:    *Correct.*

**[Gonzales Depo., p. 22/2-5]**

> Q:    *And did you report that $4,100 (paid by EM) on your federal tax return?*
>
> A:    *No*.
>
> Q:    *Why not?*
>
> A:    *I just didn't*.

**[Gonzales Depo., p. 28/9-13]**

> Q:    *So you refused to answer that question regarding the reporting of income on your taxes?*
>
> A:    *Yes*.

**[Gonzales Depo., p. 30/10-12]**

## Deposition Witness:  Gary Stewart

To try and create its case, the Plaintiff deposed Gary Stewart.  Mr. Stewart works across the United States for disaster relief projects, always as an independent contractor.  He also does drone surveillance work throughout the United States, also as an independent contractor.  He was asked by EM to be the Project Manager for the Puerto Rico Disaster Relief Project.  Mr. Stewart is a former EMT for a hospital, and has security licenses in various states.  He has performed independent contractor services for various companies (aside from EM) in various states.  He prefers working as an independent contractor, obtains his own insurance, and pays his own taxes.

-12-

Excerpts from his testimony are as follows:

- To be eligible for the project in Puerto Rico, he was required to have a license as an Armed Security Guard.
- He was required to provide his own sidearm, which he selected in his sole discretion.
- The term of his verbal agreement with EM was that he would be paid a daily rate.
- He oversaw all of the other independent contractors. Each of those other workers was provided at least one day off per week. However, he confirmed that EM paid those workers for each day of the week, including the days that they were free to go to the beach or do as they pleased.
- Most workers worked 8 hour shifts. Workers occasionally worked in excess of 8 hours, but never in excess of 12 hours.
- The Puerto Rico project was in coordination with government agencies, including *FEMA* and the Department of Homeland Security.
- He was issued a photo ID from the Puerto Rico Government which classified him as a **Contractor**.

## Deposition Witness:  Alan Kay

Plaintiff also deposed Mr. Kay.  Mr. Kay is a resident of Georgia.  He has a history of working for disaster relief projects, always as an independent contractor, and separate from the Puerto Rico project that he accepted for EM.  He prefers this type of arrangement because it provides him with autonomy, discretion and other options.  Excerpts from his testimony are as follows:

- Aside from working as an independent contractor for EM in Puerto Rico, Mr. Kay has done security work (always as an independent contractor) for 4 years.
- The terms of his verbal agreement with EM were that he would be paid $400 per day.
- He was paid the $400 per day, even on his off days.
- Mr. Kay has always worked security projects, at a daily rate, which was verbally reached.
- The agreed-upon daily rate was acceptable, whether he worked less than 8 hours per day or more than 8 hours per day.
- He provided his own equipment and chose that equipment in his sole discretion.
- His specialized training is what made him eligible for this project and enabled him to perform this project.
- He had complete autonomy as to the manner in which he performed his security services for EM.
- Following his completion of work in Puerto Rico for EM, he stayed on the island and provided the same type of security service for another security company.

-13-

- The work that he did for the other security company was also handled, by agreement, on an independent contractor basis.
- He received a 1099 tax form from EM. He was fully paid for his services by EM.
- The Puerto Rico project was in coordination with government agencies, including *FEMA*, the Red Cross, the National Guard and the United States Marine Corp.
- He was issued a photo ID from the Puerto Rican government which classified him as a **Contractor**.

## Deposition Witness:  Gary Slater

Plaintiff also deposed Mr. Slater.  Mr. Slater is a resident of Georgia.  He has done many security jobs, always as an independent contractor.  He was offered an opportunity to work for EM in Puerto Rico and accepted it based on a daily rate of $400 plus travel, housing and food.  Excerpts of his testimony are as follows.

- Mr. Slater has done security projects for other companies including a stint in Afghanistan.  He always works as an independent contractor, by choice.
- He agreed to provide security services for EM in Puerto Rico at an agreed daily rate of $400 per day.
- He agreed to the daily rate, acknowledging that he might work 4 hours a day, 8 hours a day, or more.
- He has worked various security jobs over the years, always as an independent contractor and always at an agreed-upon daily rate.
- He always receives a 1099 tax statement for his compensation.
- He reports his own income and pays his own taxes.
- He had complete discretion as to the equipment that he used in performing work for EM.
- He was paid for 7 days per week, even though he did not work every day.  Some weeks he worked 5 days, some weeks he worked 6 days.  However, EM paid him for 7 days, for each week.
- Mr. Slater testified that in concert with EM he also provided humanitarian-related services including the distribution of water and supplies to civilians with supplies that were provided by EM.
- Mr. Slater was provided a government-issued identification card from the Control Center that housed *FEMA*, the U.S. Drug Enforcement Agency, the FBI and the Federal Emergency Management Assistance Agency.
- His ID, issued by the government, designated him as a **Contractor**.

## Deposition Witness:  Orlando Rivery

Plaintiff also deposed Mr. Rivery.  Mr. Rivery is a resident of Florida.  He has done many security jobs, and always as an independent contractor.  He provided services for EM in Puerto

Rico, also as an independent contractor. Excerpts from his testimony are as follows:

- Mr. Rivery is ex-military.
- In the 20 years since leaving the military, he has regularly worked as a security officer.
- He provides security work for emergency relief jobs.
- He always works as an independent contractor, by choice.
- He agreed to a fee arrangement with EM to work in Puerto Rico at $400 per day.
- He was fully paid by EM.
- He had the sole discretion as to how he performed his security services for EM.
- He was issued an ID card by the Puerto Rican government which identified him as a "**Contratista**" which he translated as "**Contractor**."

## Deposition Witness: Timothy D. Burns

Plaintiff also deposed Mr. Burns. Mr. Burns is a resident of Georgia. He has also done many security jobs, and always as an independent contractor. He agreed to provide services in Puerto Rico for EM, also as an independent contractor. Excerpts from his testimony are as follows.

- Prior to the fall of 2017, Mr. Burns had never performed any work in any capacity for EM.
- Since the fall of 2017, Mr. Burns has not performed any work in any capacity for EM.
- He agreed to work for EM in Puerto Rico at the rate of $400 per day.
- He was paid for each day that he was in Puerto Rico, even if he did not work each day.
- He received a 1099 form from EM.
- He has been fully paid by EM.
- But for his prior military training, he would not have had the ability to perform the services in Puerto Rico for EM.
- He had complete discretion as to how he performed his services for EM.
- He received directives from T-Mobile as to the times and location that he should report to work.
- He did not receive any directives from EM regarding his hours or work location.
- He did not receive any directives from EM as to how he should perform his services. Instead, he had sole discretion in that regard.
- He obtained that ID card after meeting with several individuals, including representatives of the Puerto Rican government, a representative of *FEMA*, and a representative of the United States Department of Defense.
- He received an ID card from the Puerto Rican government that identified him as a **Contractor**.

**Deposition Witness:  Timothy Sante**

Plaintiff also deposed Mr. Sante.  Mr. Sante is a resident of Arizona.  He has also done many security jobs, and always as an independent contractor.  He provided security services in Puerto Rico, for EM, also as an independent contractor.  Excerpts of his testimony are as follows:

- Mr. Sante had no prior dealings with EM.
- When he was deployed in the military in Afghanistan, he worked with a gentleman named Danny Cage.
- Mr. Cage solicited Mr. Sante for EM's project in Puerto Rico.
- He agreed to perform work for EM in Puerto Rico at the rate of $400 per day.
- He accepted those terms, regardless of whether he might work less than 8 hours per day or more than 8 hours per day.
- EM did not exercise any discretion over the manner in which Mr. Sante performed his services in Puerto Rico.
- He received a government issued ID card from the Command Center operated by *FEMA*.  That ID card identified him as a **Contractor**.


**Affidavit:  Russell Bradshaw**

As noted, the witness, Gary Stewart, was the Project Manager for the Puerto Rico Disaster Relief Project.  He was assisted in that work by Russell Bradshaw.[6]  The Plaintiff chose (without explanation) not to depose Mr. Bradshaw.  However, EM procured a sworn statement from Mr. Bradshaw which confirms that he, and each of his coworkers, were correctly classified as independent contractors.  Mr. Bradshaw's sworn statement is as follows:

*I, Russell Bradshaw, declare under penalty of perjury the following facts are true and correct:*

1. *I am over eighteen years of age and I have personal knowledge of the matters set forth herein.*
2. *I am a Volunteer Firefighter of the Almaville, Tennessee Volunteer Fire Department and a former Reserve Deputy for the Rutherford County Sheriff Department.  I have also worked for the United States Government with the Department of Homeland Security.*
3. *I currently provide security services for hire, as an independent contractor (and not as an employee).*
4. *I prefer to work as an independent contractor, as it affords me flexibility and discretion to accept projects, reject projects and to manage how I handle those projects that I choose to accept.*

---

[6]     They are the two men who were paid a higher daily rate.

5.     *I have provided security-related services for a local company called EM Protective Services ["EM"] for approximately ten years.*

6.     *In connection with that relationship, I provided services to EM for a project which it had in Puerto Rico following the hurricane that hit that island.*

7.     *EM was hired to provide security services for the benefit of T-Mobile Cellular Services which had been commissioned by the Puerto Rican Government to restore cellular service following the hurricane damage.*

8.     *<u>I agreed to provide those services to EM on a flat and acceptable daily rate regardless of the hours devoted daily</u>.*

9.     *When I arrived in Puerto Rico, I received a government-issued badge which was issued by the Puerto Rican Government and which identified me (in Spanish language) as a "Contratistas." When I arrived, I also met with various government officials. T-Mobile, through diplomatic channels and the Federal Trade Commission, set up those meetings. The government officials then recorded the serial number of my sidearm, as well as those of all of the other individuals who travelled to Puerto Rico for EM. The government empowered us to carry weapons, and empowered us to do so, as government contractors.*

10.     *With regard to that project, <u>I had complete discretion</u> as to the equipment that I used, including the sidearm that I took with me which was then registered with the Puerto Rican Government upon my arrival.*

11.     *T-Mobile officials directed me for most of my logistical issues. Those directives concerned where we would be geographically assigned to work. Otherwise, <u>I was granted exclusive autonomy to perform my duties in my sole discretion</u>.*

12.     *EM paid me the agreed-upon flat rate. The agreed-upon rate was acceptable to me notwithstanding that on certain days I worked more than eight hours but on other days I worked less than eight hours.*

13.     *<u>I was also paid the flat daily rate on Sundays, even though I did not provide any security services on Sundays</u>. I had complete discretion to do as I pleased on Sundays.*

14.     *<u>I have been fully paid by EM and I have no complaints</u> against EM for additional compensation.*

## SUMMARY OF THE PUERTO RICO PROJECT

Each of the 7 individuals who testified in depositions regarding the Puerto Rico project confirmed that they are part of a nationwide network of individuals who regularly work on such projects, and always as independent contractors. They each confirmed that they prefer the autonomy associated with such arrangements. Regarding the Puerto Rico project, they each confirmed that they were paid the daily rate, whether they worked less than or more than 8 hours. <u>They also confirmed that they were paid that daily rate even on the days that they did not provide any services</u>. More importantly, they were each issued a government-issued ID card (from the Puerto Rican Government in connection with *FEMA*) which identified them as a "**Contractor**." There is no evidence to the contrary.

**Local Individuals Who Periodically Worked for EM**

In trying to compile its evidence, Plaintiff sought only to depose 6 individuals who worked for EM in Puerto Rico from a team that included a total of 40-50 individuals. However, Plaintiff's claims also seek overtime compensation for another 50+ individuals, here in Tennessee, who provide local traffic control services for EM. Again, those individuals total another 50+ workers (*i.e.*, the total pool of 105 workers, less the 40-50 that went to Puerto Rico). Surprisingly, Plaintiff did not depose <u>any</u> of those individuals.

Thus, and to get to the bottom of the facts, EM interviewed a number of those individuals. The sworn statements of those workers are consistent and confirm that they choose to work as independent contractors, that they like the discretion that is afforded to them as independent contractors, and that EM has fully paid them for their services. A summary of those witnesses is as follows:

**Danny Gentry:**

*I, Danny Gentry, declare under penalty of perjury the following facts are true and correct:*

1. *I am over eighteen years of age and I have personal knowledge of the matters set forth herein.*
2. *I am a retired Metro Nashville Police Officer, having achieved the rank of a Lieutenant. I worked for Nashville's Police Department for 33 years.*
3. *Beginning in 2016, I began performing security-related services for a local company called EM Protective Services ["EM"].*
4. *My compensation arrangement guarantees me a minimum of four hours of compensation, even if I report to a shift and work only one, two or three hours.*
5. *I provide services to EM as an independent contractor, by agreement. <u>I prefer this arrangement, as it allows me to be in charge of my services and</u>, also, to decide what projects I accept and for those, how to perform them and, also, what projects I decide to reject.*
6. <u>*EM does not control or otherwise govern the manner in which I provide my services. I exercise exclusive autonomy as to how I provide my services.*</u>
7. *Companies like EM hire me due to unique skills I obtained from my prior career in law enforcement.*
8. *I have on numerous occasions provided security services for EM for local construction projects (Traffic Control) whereby the contractor performing the construction project hired EM to provide security. EM then hires me to provide the security (Traffic Control), as an independent contractor. Because those construction projects affect roadways, Metro Nashville or Metro Nashville Codes Department often imposes deadlines on the*

-18-

*construction crew that requires them to leave the jobsite by 3:00 p.m. (so as not to create a traffic issue). On those occasions, I report to the job in the morning and often the construction company directs me to leave early, by like 3:00 p.m. However, on those occasions, I am fully compensated for the full eight hours (i.e., two, four-hour shifts).*

9.  *I log my hours in four hour increments, even if I work less than four hours. Thus, the hourly log will show at least four hours, even if I worked less than four hours.*

10. *In connection with my independent contractor services to EM, I provide all of my own equipment, including my own vehicle with lights, gear and other security-related equipment.*

11. *I have been fully paid by EM and I have no complaints against EM for additional compensation.*


## Al Lopez:

*I, Al Lopez, declare under penalty of perjury the following facts are true and correct:*

1.  *I am over eighteen years of age and I have personal knowledge of the matters set forth herein.*

2.  *I am active military. On my days off, I have in the past been retained on occasion to perform security-related services for a company called EM Protective Services ("EM"). I only work for EM on a limited basis when I am available and when I desire to earn extra money.*

3.  *My compensation arrangement requires EM to pay me a minimum of four hours of compensation. Thus, if EM asks me for assistance on a project that is for less than four hours (such as two or three hours), I am paid nonetheless for the full four hours. I have on occasion worked two shifts in a single day. Therefore, on those days, I am paid for a full eight hours of compensation, even though each of my two shifts may have been for less than four hours each. My time record would show working eight hours, and I would be paid for all eight hours, even though I may have worked less than eight hours.*

4.  *I have also on occasion (although only rarely) worked shifts that required me to work more than eight hours. On those occasions, I am always fully paid.*

5.  *The hours that I work for EM are recorded by using EM's Job App. If I leave a job prior to the completion of the four-hour shift, I still log in on the app for the full four hours. I am then paid for the four hours, even though on many occasions I work less than the four-hour shift. As a result, the job app would reflect that I worked hours that were more than the actual hours worked on those occasions when I left prior to the full four-hour shift. But, I have always been fully paid.*

6.  *I have also in the past provided similar security services for an unrelated company called C&L. My work arrangement with that other company was substantially similar to my work arrangement (and compensation arrangement) with EM.*

7.  *I have been fully paid by EM and I have no complaints against EM for additional compensation.*

## ARGUMENT

### I.
### Plaintiff has the Burden to Reclassify EM's Workers as Employees

In a case such as this, the Plaintiff has the burden to "establish an employer-employee relationship." *See, Stansbury v. Faulkner,* 443 F. Supp. 3d 918, at 925 (W.D. Tenn. 2020). *See also, Parrish v. Premier,* 917 F. 3d 369, at 375-377 (5th Cir. 2019) likewise holding that the plaintiff has the burden of establishing the *prima facia* case for the existence of an employer-employee relationship.

Thus, Plaintiff has the burden of establishing that <u>each</u> of the 105 workers should be reclassified as an employee (rather than as independent contractors). However, in attempting to establish this, Plaintiff deposed only 6 of the 105 individuals.[7]

There is then the testimony of the sole complainant, Hector Gonzales (who Defendants' counsel deposed). Of those 7 deponents, each testified (including Mr. Gonzales) that they have historically worked as independent contractors and that they prefer to work as independent contractors. They each also testified that the basic terms of their engagement were agreed upon, in advance, including that they would be paid a fixed daily rate whether they worked less than 8 hours or more than 8 hours. There is no dispute that each of these individuals were also paid the full daily rate <u>even on those days in which they were relieved from duty</u> – *i.e.,* "off days" or "admin days."

There is no way to reinterpret the 7 depositions that results in a different conclusion. However, even if that were the case, the facts surrounding those 7 individuals cannot be judicially interpreted and then applied universally to the remaining 98 workers (*i.e.,* the total pool of 105 less

---

[7] Plaintiff also deposed the individual Defendant and Defendant's C.F.O., but they are not part of the pool of 105 workers.

the 7 individuals who were actually deposed).  Plaintiff offers <u>no</u> proof regarding those other 98 workers.

**II.**
**The Totality of the Facts Confirm that the Workers**
**Were Properly Treated as Independent Contractors**

In determining whether a worker is an employee, the courts typically apply an "economic-reality test."  This test is a loose formulation, leaving the determination of the employment status to a case-by-case resolution based on the totality of the circumstances.  *See, Perez v. Off Duty Police Services, Inc.,* 2015 WL 4068392 (W.D. Kentucky 2015).  Central to the inquiry is whether the alleged employer directs the method of performance, supervises day-to-day conduct, or dictates the hours that individuals worked.  *See, Perez,* quoting *Donovan v. Brandel,* 736 F. 2d at 1114 (6th Circ. 1984).

A.     <u>**Autonomy**</u>

<u>Puerto Rico</u>:  EM did not exercise control regarding performance issues or day-to-day conduct in Puerto Rico.  Instead, it granted each worker autonomy as to the type of equipment they used and the manner in which they provided services.  The evidence from the 7 deponents confirms as much.  In like manner, EM did not dictate the hours that individuals worked.  Instead, the hours worked were coordinated between the actual workers and T-Mobile's communication engineers.  This was while T-Mobile was working under the authority of *FEMA* and other governmental agencies to reinstitute communications on the island.

<u>Local Workers</u>:  With regard to EM's local workers, Plaintiff has no proof.  And, the affidavits filed by EM confirm that the local workers have autonomy.

## B.    Other Work

The Court in *Perez* also placed significance on whether workers work solely for the alleged employer or whether they work for other companies. The Court held that "*if a worker has multiple jobs for different companies, that fact weighs in favor of classification as an independent contractor.*" *Id.,* at p. 5 of 6. Here, none of the 105 men works exclusively for EM, and there is no proof to the contrary.

## C.    Contract

Here, each witness confirmed a verbal contract (before providing any work) that deemed the workers as independent contractors, and not employees. That arrangement is material to the issue herein. *See also, Jammal v. American Family Insurance Co.,* 914 F. 3d 449 (6th Cir. 2019) holding that the existence of a contract between the parties to be an "independent contractor" is "*relevant to the inquiry and shows how the parties themselves viewed the nature of their working relationship*." *Id.,* at p. 459. In this case, each of the individuals acknowledges that they accepted the terms of their project as an independent contractor, <u>and</u> in keeping with the manner in which they have historically worked on similar projects (and for <u>other</u> companies). There is no proof to the contrary.

## D.    Special Skills

In *Jammal*, the Court also pointed out that where highly specialized skills are required, that it weighs in favor of independent/contractor status. *Id.,* at p. 457. Regarding the Puerto Rico project, each of the individuals testified that in order to be eligible for this project, they had to have certain skills, licenses, certifications and experience. There is no proof to the contrary.

As noted, upon arrival, each of the Puerto Rico workers also received a badge directly from the Puerto Rico Government which classified them as a "Contratista" (*translation, "Contractor"*). This was pursuant to the Letter of Authorization issued by the Puerto Rico Government on October

1, 2017, which expressly provided for security personnel for T-Mobile Puerto Rico, LLC. This is consistent with *Puerto Rico Statute Title 25, Section 3127*, which expressly authorizes the Governor of Puerto Rico to augment local police forces by authorizing "*the enlistment of special agents for the time he/she may deem necessary.*" *See also, Puerto Rico Law Title 25, Section 3128,* expressly providing for the entering into contracts for "*security services to be rendered in addition to those already provided ..., as well as with private security enterprises.*" There is no proof to the contrary.

### E.    Taxes

How an individual handles the payment of their income taxes is also relevant in analyzing whether a worker should be classified as an independent contractor or as an employee. *See, Robinson v. KKC Holdings,* 2020 WL 7864398 (W.D. Tenn. 2020) holding that the totality of the circumstances should take into account whether a worker reports their income as an employee or as an independent contractor. Here, the individuals testified that they report their income as independent contractors having received 1099 statements (versus W-2 statements).

The only exception was the worker, Hector Gonzales. He elected to hide his income from the IRS. His attempt to avoid taxes is on him; not EM.

### F.    Governmental Work

As noted, this Court is to take into account the totality of the circumstances in determining whether EM's workers should be reclassified as employees. As noted, the bulk of Plaintiff's claims is to recover damages arising from the Puerto Rico project. However, the men sent to Puerto Rico all confirmed that they worked under the State of Emergency issued by the Puerto Rican Government. Upon arrival, they were exempted from Puerto Rican gun laws and instead provided authority to carry sidearms in order to provide their security services. Those sidearms were then registered, weapon by weapon, with the Puerto Rican Government at a Command Center

that included representatives of the Puerto Rican Government, *FEMA*, the Department of Homeland Security, the National Guard, and the FBI.  Upon completing their registration and after providing proof of licensure as Armed Security Guards, they were then each issued an ID card by the Puerto Rican Government.  Those ID cards designated them as "**Contratista**" which translates to "**Contractor**."

This designation by the Puerto Rican Government was consistent with the knowledge that each of the workers had, going into the project, and consistent with the knowledge of EM; *namely*, that they were brokering a labor force to operate as independent contractors.  This is consistent with the Court's ruling in *Jammal v. American Family Insurance,* 914 F. 3d 449 (6th Cir. 2019) where it held that how the parties viewed themselves is relevant in determining whether they should be classified as independent contractors or as employees.  In this case, <u>everyone involved</u>, from the Puerto Rican Government, the Department of Homeland Security, EM, to the actual workers, all viewed the workers as independent contractors.  Plaintiff's attempt to ignore that reality is contrary to the actual facts.

### III.
### Plaintiff's Monetary Calculations Are Not Supported by Evidence

Plaintiff seeks to recover $350,849.22 for overtime compensation.  In calculating its claim, Plaintiff took certain baseline assumptions, and then extrapolated those assumptions onto each of the 105 workers that it seeks to reclassify.  However, the evidence does not support Plaintiff's broad assumptions or those extrapolations.

To start, in calculating its claim, Plaintiff arbitrarily selected an hourly rate of $20 per hour.  Thus, for a 40-hour work week, this results in standard weekly pay of $800.  The individuals who were involved in the Puerto Rico project testified that they worked 6 days a week.  Plaintiff arbitrarily contends that their compensation should be calculated at 12 hours per day, even though

Plaintiff's deponents testified that they sometimes worked less than 12 hours a day, and sometimes less than 8 hours a day. Yet, Plaintiff took 12 hours per day and then multiplied it over 6 days constituting a work week of 72 hours.

Therefore, Plaintiff's calculations (*if we were to assume them as accurate*) total as follows:

- $20 per hour x 40 hours per week            = $   800
- $30 per hour (time and a half) x 32 hours    = $   960
- Total                                                      $1,760

However, each of the individuals who have testified, *i.e.,* those who were actually in Puerto Rico, testified that they were paid $400 day, 7 days a week (even though they didn't work 7 days per week). This equates to weekly compensation of $2,800. This exceeds the Plaintiff's calculation of $1,760.

Hence, (i) even if each worker was reclassified as an employee, (ii) and even if one assumes everyone worked 12 hours each day, and (iii) even if each were awarded time and a half for the additional 32 hours (*i.e.,* 12 hours a day x 6 = 72 less 40 = 32), then they would have been due only $1,760 per week.

Having been paid $2,800 per week, they were all paid an amount which dramatically exceeds Plaintiff's number.

**The Individual Calculations – Puerto Rico**

As part of its calculations, Plaintiff also monetized the specific claims of the individuals that it chose to depose. Plaintiff's calculations for what Plaintiff believes those individuals are due, is completely contrary to the sworn testimony of those workers. This is summarized by the following:

- **Alan Kay**: Plaintiff contends that Mr. Kay is due an additional $5,790.98. However, Mr. Kay testified, under oath, that he is not due any additional money.

- **Orlando Rivery**:  Plaintiff contends that Mr. Rivery is due an additional $5,5,89.67.  However, Mr. Rivery testified, under oath, that he is not due any additional money.

- **Timothy Sante**:  Plaintiff contends that Mr. Sante is due an additional $7,466.67.  However, Mr. Sante testified, under oath, that he is not due any additional money.

- **Gary Slater**:  Plaintiff contends that Mr. Slater is due an additional $8,804.88.  However, Mr. Slater testified, under oath, that he is not due any additional money.

- **Gary Stewart**:  Plaintiff contends that Mr. Stewart is due an additional $8,882.40.  However, Mr. Stewart testified, under oath, that he is not due any additional money.

- **Timothy Burns**:  Plaintiff contends that Mr. Burns is due an additional $6,411.99.  However, Mr. Burns testified, under oath, that he is not due any additional money.

## The Individual Calculations – Local Projects

As noted, the Plaintiff has not taken a deposition of a single worker that concerns traffic control (local) projects.[8]  Nonetheless, Plaintiff would have this Court globally conclude that if the individuals in Puerto Rico are to be re-classified, then all of EM's local workers should likewise be re-classified.  As part of that attempt, Plaintiff has provided calculations for a number of EM's local workers.

As part of its calculations, Plaintiff monetized the specific claims of the individuals who have worked for EM locally on traffic control projects.  Plaintiff made those calculations even though it did not depose any of those local workers.  As with the Puerto Rico calculations, Plaintiff's calculations are contrary to the sworn affidavits produced by a sampling of those workers.  This is summarized by the following:

- **Russell Bradshaw**:  Plaintiff contends that Mr. Bradshaw is due an additional $11,229.06.  However, Mr. Bradshaw signed an affidavit, under oath, attesting that he is not due any additional money.

---

[8]     The only depositions that Plaintiff has taken concern individuals who worked in the disaster relief project in Puerto Rico.

- **Al Lopez**: Plaintiff contends that Mr. Lopez is due an additional $5,772.50. However, Mr. Lopez signed an affidavit, attesting under oath, that he is not due any additional money.

- **William Guthoerl**: Plaintiff contends that Mr. Guthoerl is due an additional $1,350. However, Mr. Guthoerl has testified that he was fully compensated.

## The Overall Calculations – Local Traffic Projects

It is also noteworthy that in paying its workers for local traffic projects, EM pays those workers in 4-hour increments, even if they are released from the job in advance of the 4-hour shift. This is confirmed by the above-referenced affidavits of Danny Gentry and Al Lopez. Plaintiff has no proof to the contrary.

This is further confirmed by the sworn testimony of EM's Chief Operation Officer, William Guthoerl. His sworn statement is as follows:

*I, William Guthoerl, being duly sworn state as follows:*

- *I am over 18 years of age and I have personal knowledge of the matters set forth herein.*
- *I am the Chief Operating Officer for EM Protective Services [hereinafter "EMPS"].*
- *In my official capacity, I am directly involved in scheduling, reviewing and tracking the compensation otherwise due to the individuals which EMPS contracts.*
- *I have personally reviewed the report prepared by Tom Gray of the Department of Labor. It is factually flawed for several reasons. It duplicates hours, incorrectly, and it calculates hours worked based upon the minimum contractual standard and the practice of compensating in one half hour increments, rather than actual time worked.*
- *Industry and contractual standards are that officers are compensated at a minimum equivalent of four hours. If an officer works thirty minutes, which may be common for traffic related work, they are still paid four hours at their minimum rate. Because of this, time reporting always reflects a minimum of four hours. In addition, time is rounded to the next half hour. Thus, if a contractor worked four hours and ten minutes, they would be compensated for four hours and thirty minutes. This is significant because the time accountability system used by EMPS was not developed to report the actual termination time of an individual's services, rather the time the individual should be compensated for.*
- *In calculating compensation, the investigator on many instances had entries which reflected that officers' hours of compensation exceeded the 24 hours within the day. This resulted from multiple entries submitted by an officer on a single day. In some instances, however, the time reporting system would duplicate an officer's entry and in the case of other officers, the hours or days that would be reported. While it was clear to EMPS that its contractors were duplicating entries, the logs were not corrected because the removal of the duplicate entries would have been time consuming and unnecessary because EMPS thought that the logs would only serve as a record in making payment. Thus, EMPS paid*

*the correct payment. None of the contractors used by EMPS have claimed to be under reported (or under paid) and therefore the time logs were never corrected.*

Thus, Plaintiff's calculations for the traffic projects are inconsistent with the testimony of the workers which Plaintiff seeks to protect, and also EM's timing system.

## <u>CONCLUSION</u>

For the reasons set forth herein, Defendants request the entry of a Summary Judgment dismissing all claims against them.

Respectfully submitted,

<u>/s/ Phillip Byron Jones</u>
Phillip Byron Jones (#14125)
Evans, Jones & Reynolds, PC
401 Commerce Street, Suite 710
Nashville, TN 37219-2424
(615) 259-4685
Pjones@ejrlaw.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served on this the 23rd day of February, 2021, as follows:

| <u>Addressee</u> | <u>Method(s) of Service</u> |
|---|---|
| **Mr. Thomas J. Motzny**<br>U. S. Department of Labor (Nashville Office)<br>Office of the Solicitor<br>618 Church Street, Suite 230<br>Nashville, TN 37219-2456<br>motzny.thomas.j@dol.gov<br><br>*Attorney for Plaintiff* | X   Electronically via the Court's ECF System<br><br>□   U.S. Mail<br><br>□   Email |

/s/ Phillip Byron Jones
Phillip Byron Jones

846301.024