**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MARTIN J. WALSH,** | ) | |
| **Secretary of Labor,** | ) | |
| **United States Department of Labor,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:19-cv-00700** |
| | ) | |
| **v.** | ) | **JUDGE CAMPBELL** |
| | ) | **MAGISTRATE JUDGE NEWBERN** |
| **EM PROTECTIVE SERVICES** | ) | |
| **LLC and ERIK MAASIKAS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the Court is the Secretary of Labor's Motion for Partial Summary Judgment. (Doc. No. 41). In support of the Motion, the Secretary filed a Memorandum (Doc. No. 42), Statement of Undisputed Material Facts (Doc. No. 43), and a number of exhibits (Doc. Nos. 43-1 through 43-11). Defendants filed a Response in opposition to the Motion (Doc. No. 49), and filed a Response to Plaintiff's Statement of Facts (Doc. No. 50).

Also pending before the Court is Defendants' earlier-filed Motion for Summary Judgment. (Doc. No. 37). In support of the Motion, Defendants filed a memorandum of law (Doc. No. 38), and Statement of Uncontested Facts (Doc. No. 39), and two exhibits (Doc. Nos. 38-1, 38-2).

The Secretary filed objections to Defendants' motion, noting, among other deficiencies, that despite numerous references to deposition testimony and several newly procured declarations, Defendants did not file the depositions or declarations as exhibits. (Objection, Doc. No. 45). Defendants responded to the Secretary's objections stating that because they knew the Secretary would also being filing for summary judgment and would rely on the same depositions, Defendants

1

did not separately scan and file their own exhibits. (Doc. No. 51). Defendants stated that "out of an abundance of caution" it was filing copies of the evidence upon which it relied in opposition to Plaintiff's Motion for Partial Summary Judgment and in support of Defendants' Motion for Summary Judgment. (*Id.*; exhibits filed at Doc. No. 49).

The Court found that the Secretary was prejudiced by Defendants' failure to support their assertions with evidence in the record, particularly several declarations to which he did not have copies. (Doc. No. 52). The Court therefore Ordered Defendants to show cause why the Court should not strike the late filed documents. (*Id.*).

In response to the Order to Show Cause, Defendants stated that the failure to timely file evidence in support of the motion was not in bad faith, that the Secretary had access to the deposition transcripts, the contents of the affidavits were copied in their entirety into the memorandum. (Doc. No. 53). Defendants argue that even if the Court does not consider the late-filed documents while reviewing Defendants Motion for Summary Judgment, it should nevertheless consider the same documents with regard to Defendants' Response to the Secretary's Motion. (*Id.*). As an alternative to striking the late-filed documents, Defendants request the Court require Plaintiff to file an amended response to Defendants' Statement of Uncontested Facts. (*Id.*).

For the following reasons, Defendants' Motion for Summary Judgment will be **DENIED**. The failure to file relevant exhibits accompanying the motion prejudiced the Secretary's ability to respond fully. This prejudice was not remedied by the filing of exhibits, which was one month after filing the motion and one day after the Secretary responded to the motion. Equally as important with regard to the Court's ability to consider the motion, Defendants' Memorandum (Doc. No. 38) is almost entirely devoid of citations to the record or to specific statements of fact. The Court is not obligated to "scour the record" to find evidentiary support for Defendants' factual

2

assertions. *See e.g.*, *Shorts v. Bartholomew*, 255 F. App'x 46, 50 (6th Cir. 2007). Local Rule 7.01 requires that motions must be accompanied by a supporting memorandum of law "citing supporting authorities, and, where allegations of fact are relied upon, affidavits, depositions, or other exhibits in support thereof." Filing a statement of undisputed material facts does not relieve a party of its obligation to provide citations within the memorandum itself.

Accordingly, the Court declines to consider Defendants' Motion for Summary Judgment.[1] However, the Court will not strike Defendants' exhibits (Doc. No. 49-1 to 49-13). Although these exhibits were not timely filed in support of Defendants' Motion for Summary Judgment, they were appropriately filed in Response to the Secretary's Motion for Partial Summary Judgment and will be considered accordingly.

## I.    BACKGROUND

EM Protective Services LLC ("EM") is a corporation that provides security and traffic control services. (Doc. No. 50, ¶¶ 5). Erik Maasikas is the owner and president of EM. (*Id*. at ¶¶ 2-3). William Guthoerl is EM's Chief Operating Officer ("COO"). (*Id*., ¶ 9). Together, Maasikas and Guthoerl manage the day to day operations of EM. (*Id*., ¶ 8). During the past five years, Maasikas himself has not done any of the work on any job for EM – he does not visit job sites or do any of the work on the contracts. (*Id*., ¶ 17; *see also* Maasikas Dep., Doc. No. 43-1 ("I don't work, so I dictate to somebody to do the work.")). All of the security and traffic control work provided by EM is performed by individuals classified by EM as independent contractors. (*Id*., ¶ 13). The Secretary contends the individuals performing traffic control and security services on

---

[1] The Court also notes that Defendants' Motion (Doc. Nos. 37, 38), which is substantially the same as their Response in opposition to the Secretary's Motion (Doc. No. 49), does not show shown an absence of material fact as to whether the workers are independent contractors.

3

behalf of EM were incorrectly classified as independent contractors and that they are, in fact, employees under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*.

EM services are divided relatively equally between security services and traffic control. (*Id*., ¶¶ 5-6). During hurricane season, security services increases to approximately 60% of EM's business. (*Id*., ¶ 7).

Individuals providing security services must have a security guard license or be uniformed police officers. (*Id*., ¶ 18). Maasikas stated that the only verification that someone is a uniformed police officer is visual confirmation of their police-issued uniform. (*Id*., ¶ 24). To obtain a security guard license, an individual must complete a class through the state. (*Id*., ¶¶ 22-23). An unarmed guard license requires an eight-hour class. (*Id*.). Armed guards must complete a 16-hour class. (*Id*.). The majority of EM's security work is unarmed. (*Id*., ¶ 24). EM does not provide any training to its workers and no additional training is required to work for EM. (*Id*., ¶ 28).

Security guards are required to provide their own uniform, and, if armed, to supply their own firearm(s). (*Id*. ¶¶ 58). Whether armed or unarmed, the only task of security guards is to serve as a visual deterrent by standing in a location. (*Id*., ¶¶ 59-60). Depending on the job, the site manager will determine where the guard is located. (*Id*., ¶ 61). On other occasions, particularly where a large number of workers are placed together, EM may designate one worker as a supervisor. (*Id*., ¶ 72).

Traffic control workers must complete a four-hour class to be "certified flaggers." (*Id*., ¶ 25). EM does not provide any training to its workers and no additional training is required to work for EM. (*Id*., ¶ 28). They must provide their own boots, traffic vest, and hard hat, but are otherwise not expected to have their own equipment. (*Id*., ¶¶ 62, 67). Traffic control workers do not control how they perform their job duties. (*Id*., ¶ 64). If a road or sidewalk is closed, a traffic control

4

worker will stand by the closure sign to make sure no one goes around the sign. (*Id.*, ¶¶ 65-66). If a lane is closed, two workers are required to regulate traffic with "stop" and "go" signs. (*Id.*, ¶ 65). Traffic control workers are directed by the police or the construction company depending on the requirements of the job. (*Id.*, ¶ 73).

Whether working as security or traffic control, EM workers have no contractual relationship with the clients for whom the work is performed. (*Id.*, ¶ 74). If a client has complaints about a worker, those complaints are handled by EM, which reserves the right to replace a worker. (*Id.*, ¶ 75).

EM has invested more than $400,000 in company vehicles. (*Id.*, ¶ 79). It owns approximately 30 vehicles that are used by EM workers, all of which are marked with EM's logo, name, and phone number. and equipped with GPS systems. (*Id.*, ¶¶ 80-81). EM also owns various light bars, "flashy lights," generators, and radios, that are used by its workers when needed. (*Id.*, ¶¶ 84-89).

In addition to traffic control and security services provided domestically, EM provided security services for T-Mobile in Puerto Rico after Hurricane Maria in 2017. (*Id.*, ¶¶ 98-100, 129). At the start of the project, EM sent a group of 12 workers who had already been working for EM in Florida to Puerto Rico on a private plane provided by T-Mobile. (*Id.*, ¶¶ 104-105). Ultimately, Maasikas and one of EM's workers, Gary Stewart, recruited 30-40 people to work in Puerto Rico. (*Id.*, ¶ 106). Stewart was responsible for managing EM's workers in Puerto Rico. (*Id.*, ¶ 122). Stewart and Matt Tenbarge, another EM worker, "ran the contract" in Puerto Rico. (*Id.*, ¶123). Each day Gary Stewart met with T-Mobile executives, who told him what they wanted to do that day. (*Id.*, ¶¶ 127-28). Stewart would then pass work assignments to the other EM workers through the T-Mobile GPS tracking system. (*Id.*). He explained that because there was no cell service, each

5

of the workers had GPS trackers. (Stewart Dep., Doc. No. 43-4 at 40). Some workers guarded cell towers in 12-hour shifts. (*Id*., ¶ 130). Others worked in pairs as security for T-Mobile technicians into the field. (*Id*., ¶ 134). Workers had some discretion regarding how to execute their particular assignments – for example, how to handle their particular patrols – but they did not determine the assignments themselves, or when to begin and end each day. (*Id*., ¶¶ 139-142).

EM workers in Puerto Rico were not provided any training by EM or told how long the job would last; but they were instructed to bring a gun, ammunition, magazine, body armor, and clothing. (*Id*., ¶ 118-20). The workers were required to have military or law enforcement experience and a registered firearm. (*Id*., ¶¶ 108-110).

The terms of the assignment were the subject of verbal agreements between the workers and EM. (Doc. No. 48, ¶¶ 15-18; 28; 35; 59; 66, 77). The workers agreed to work as independent contractors for the duration of the project for a set daily rate. (*Id*.). Except for a few workers with oversight roles who were paid a higher daily rate, the workers were paid $400 per day, seven days a week, regardless of how many days or hours per day they actually worked. (*Id*.; *see also* Doc. No. 50 ¶ 111). EM provided airfare, lodging, and rental cars (paid upfront by EM and later reimbursed by T-Mobile). (Doc. No. 50, ¶¶ 112-13).

The workers were issued photo ID cards indicating that the workers were designated as "Contratistas" (Contractor). (Doc. No. 48, ¶¶ 54, 62, 73, 80). As discussed below, who issued the identification cards is not material for resolution of the instant motion. However, the Court notes that the workers had varying recollections regarding who issued the ID cards. (*See* Rivery Dep. at 41 (recalling the ID card as issued by EM); Burns Dep. at 69 (ID issued by the Puerto Rico Government); Santo Dep., at 53-54 (ID issued from the "Command Center"); Maasikas Dep. at 159-60 (ID issued from the "Command Center")). The badge states "Government Command

Center" in English and Spanish at the top, and bears the seal of the Governor of Puerto Rico. (*See* Doc. No. 48-11 (badge of Gary Steward)).

The Secretary contends the EM workers are covered by the Fair Labor Standards Act and that EM violated the Act by failing to pay the workers one and a half times the regular rate of pay for hours worked in excess of 40 hours in a workweek. (Am. Compl., Doc. No. 31, ¶ VI). The Secretary further claims EM violated the Act by failing to make, keep, and preserve adequate and accurate records of the persons employed and of the wages, hours, and other conditions and practices of employment. (*Id*., ¶ VII). The Secretary filed a Motion for Partial Summary Judgment seeking entry of judgment on certain elements of the claims. (Doc. No. 41).

## II.     STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.*

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been

7

presented to make the issue of material fact a proper jury question. *Id.* The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence of which the jury could reasonably find for the nonmoving party. *Rodgers* 344 F.3d at 595.

Whether a worker is an employee is a mixed question of law and fact. *Keller v. Miri Microsystems, LLC*, 781 F.3d 799, 806 (6th Cir. 2015). "[W]here there is a genuine issue of fact or conflicting inferences can be drawn from the undisputed facts, … the question is to be resolved by the finder of fact in accordance with the appropriate rules of law." *Id.* (quoting *Lilley v. BTM Corp.*, 958 F.2d 746, 750, n.1 (6th Cir. 1992) (holding that employee status was an issue for the jury)).

## III.     ANALYSIS

The overtime provision of the FLSA, Section 7, 29 U.S.C. § 207(a)(1), provides:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

The Secretary seeks partial summary judgment on the following issues: (1) the individuals performing security and traffic control services are employees of Defendants; (2) the Defendants are employers; (3) Erik Maasikas is an employer; and (4) the employees were employed in an enterprise engaged in commerce.

For their part, Defendants dispute that the individuals who performed work for EM are employees within the meaning of the statute, and therefore that EM is an employer. (Doc. No. 49 at 2). Defendants do not dispute that EM is an enterprise engaged in commerce or that if EM is an

8

employer, Erik Maasikas would be deemed a statutory employer. (*Id*.). The threshold question then is whether the individuals working for EM were employees or independent contractors.

"The FLSA is 'a broadly remedial and humanitarian statute … designed to correct labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.'" *Acosta v. Off Duty Police Svcs., Inc*., 915 F.3d 1050, 1054 (6th Cir. 2019) (quoting *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984)). The FLSA requires employers to pay overtime wages to employees who work more than 40 hours in a week. *Id*. (citing 29 U.S.C. § 207(a)(1)). The FLSA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "Employ" is defined as "suffer or permit to work." 29 U.S.C. § 203(g). "The definition of 'employee' in this context is 'strikingly broad' and includes 'some parties who might not qualify as such under a strict application of agency law principles.'" *Off Duty* Policy, 915 F.3d at 1055 (quoting *Keller*, 781 F.3d at 804)).

To determine whether a worker is an "employee" under the FLSA, the Court disregards the labels attached to the worker and instead looks to see whether the worker is, as a matter of "economic reality," an "employee." *Id*.  The economic reality test considers six factors, none of which is determinative. *Off Duty Police*, 915 F.3d at 1055. Each of the factors is considered "with an eye toward the ultimate question – [the worker's] economic dependence on or independence from the alleged employer." *Id*. (quoting *Keller*, 781 F.3d at 804).

The six factors are: (1) the permanency of the relationship between the parties; (2) the degree of skill required for the rendering of the services; (3) the worker's investment in equipment or materials for the task; (4) the worker's opportunity for profit or loss, depending upon his skill; (5) the degree of the alleged employer's right to control the manner in which the work is

performed; and (6) whether the service rendered is an integral part of the alleged employer's business. *Id*. (citing *Keller*, 781 F.3d at 807).

The Secretary argues that this case presents "essentially the same factual scenario" as that in *Acosta v. Off Duty Police Services*, 915 F.3d 1050 (6th Cir. 2019), in which the defendant company, which also provided traffic control and security services, was found to have misclassified its workers as independent contractors. (*See* Doc. No. 42 at 9). Notably, *Off Duty Police* was decided following a bench trial where the court considered the evidence and made findings of fact. Such is not the case here. However, bearing in mind the different procedural posture of *Off Duty Police*, the reasoning is applicable and discussed below with regard to the factors to be considered.

Before delving into the factors, the Court will dispense with one of Defendants' primary arguments. Defendants repeatedly assert that the workers verbally agreed to work as independent contractors, preferred to work as independent contractors, worked for others as independent contractors under similar arrangements, and were viewed by "everyone involved," including the Department of Homeland Security and the Government of Puerto Rico, as independent contractors. Whether the workers agreed to work as independent contractors is not relevant to the determination of whether they are employees under the FLSA. *See Keller*, 781 F.3d at 808 (holding that the existence of a contract is irrelevant because "the FLSA is designed to defeat rather than implement contractual arrangements"); *see also*, *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981) (holding FLSA rights cannot be abridged by contract or otherwise waived). The fact that some of the workers worked for other companies as independent contractors under similar compensation structures has no bearing on this case.

10

As evidence that the Government of Puerto Rico and the Department of Homeland Security viewed the EM workers in Puerto Rico as independent contractors, Defendants point to the ID badges issued to the workers that identified them as "Contratistas." (Doc. No. 49 at 22-23). As discussed above, how the parties, or others, viewed their relationship is not determinative of whether the workers were employees for purposes of the FLSA.

The Court now proceeds to address the "economic reality" factors in turn.

A.      **Permanency of the Relationship**

"Generally, independent contractors have variable or impermanent working relationships with the principle company because 'they often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work for only one employer and such relationship is continuous and indefinite in duration." *Keller*, 781 F.3d at 807.

However, exclusivity is not necessarily required. *Off Duty Police*, 915 F.3d at 1057. An employee could work multiple part-time jobs on a regular basis and does not lose benefits under the FLSA by working for more than one employer. *Id*. Also, where, as here, the lack of permanence is due to operational characteristics intrinsic to the industry rather than to the workers' own business initiative" this factor is less probative. *Keller*, 781 F.3d at 808 (citing *Brock v. Superior Care, Inc*., 840 F.2d 1054, 1060 (2d Cir. 1988)).

In *Off Duty Police*, the court considered circumstances similar to those in this case. 781 F.3d at 1050. In that case, the workers performed traffic control and security services on an intermittent basis depending on customer needs. *Id*. at 1053. The Sixth Circuit held that the fact that some of the workers had other sources of income had little impact on the worker's employment status. *Id*. at 1058. Instead the court found that the permanence factor supported employee status for workers whether or not they had day jobs because the evidence showed the workers had only two primary sources of employment – their day jobs and their positions at the defendant company.

11

*Id.* More importantly, many of the workers maintained their relationship with the company for years, in some cases decades. *Id.*

As stated above, *Off Duty Police* was decided following a bench trial where the court considered the evidence and made findings of fact. Not only is this case at a different stage, the evidence suggesting permanency is not as extensive.

Defendants admit that some of the over 105 workers at issue in this case have worked for the company for more than five years and that some of the workers work full-time for EM.[2] (*Id.*, ¶¶ 49-50; *see* Maasikas Dep., Doc. No. 43-1 at 34 ("Q: Do some people work full-time for EM Protective Services? A: Yes. I guess so. Yeah.")). At least one worker, William Guthoerl, the company's Chief Operating Officer, has worked for EM since its inception in 2010. (Doc. No. 50, ¶ 9). At least 12 of the Puerto Rico workers had previously worked for EM; others had no prior relationship with EM. (*See* Doc. No. 50, ¶ 104; Kay Dep., Doc. No. 49-11 at 8-9).

Though they were not prohibited from seeking additional work "after hours," the EM workers in Puerto Rico testified they worked exclusively for EM for the duration of the project. (*See* Gonzalez Dep., Doc. No. 49-9 at 75-77 (not specifically prohibited from working with other companies, but never sought to do so); Burns Dep., Doc. No. 43-5 at 46 (stating that he did not have time to work for other companies because of "the length of work days we were working"); Kay Dep., Doc. No. 49-11 at 59 (worked for another company after leaving EM)).

---

[2] Defendants claim that "none of the 105 men works exclusively for EM." (Doc. No. 49 at 20-21). This assertion is unsupported by citation to evidence in the record. (*Id.*). Moreover, although the workers in Puerto Rico testified that they have worked for other companies, during the time they were in Puerto Rico working for EM, none claimed to have other simultaneous employment.

12

With regard to the workers in Puerto Rico, on balance, this factor weighs in favor of classification as an employee. However, in light of the temporary nature of the work, this factor is afforded less weight.

With regard to the domestic traffic control workers and security guards, the evidence is that some of the workers have worked for the company for more than five years and some work for the company full-time. Competing inferences can be drawn from this evidence. If some of the workers have worked for the company for more than five years, some have worked for the company for less time. Likewise, if some of the workers work full-time, some do not.

**B.    Degree of Skill**

The factor assesses the complexity of the work performed, how the worker acquired their skill, and the length of the worker's training period. *See Off Duty Police*, 915 F.3d at 1055-56. EM provides no training to any of its workers.

Traffic control requires minimal training – a four-hour course – and relatively little skill. Traffic control workers stand by road and sidewalk closure signed to make sure no one goes around or direct traffic around closed lanes using stop/go paddles. With regard to the traffic control workers, this factor favors employee status.

Unarmed and armed security guards have slightly more training – eight and sixteen hours respectively. Workers in Puerto Rico were required to have either military or police experience. (Doc. No. 50, ¶¶ 108-09). Defendants admit that the only task required by security guards is to stand in a location as a visual deterrent. (*Id*., ¶¶ 59-60; Maasikas Dep., Doc. No. 43-1 at 74-75 (Q: Other than be a visual deterrent, do [security guards] do anything else? A: No."). The evidence suggests that security guards, whether armed or unarmed, also require minimal skill. Accordingly, this factor also favors employee status for security guards.

## C.    Investment in Equipment or Materials

"This factor compares the worker's total investment in the company to 'the company's total investment, including office rental space, advertising, software, phone systems, or insurance' and 'is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered.'"*Gilbo v. Agment, LLC*, 831 F. App'x 772, 776 (6th Cir. 2020)(citing *Keller*, 781 F.3d at 810).

Here, the investments by the workers were relatively minor compared to those of the company. Workers were required to provide their own appropriate clothing. For security guards who were not uniformed officers, this meant they had to purchase a security-type uniform. Armed guards were required to supply their own firearm. Although some workers may have obtained independent insurance, they were not required to do so.

In contrast, EM invested significant resources into equipment that was used by workers or otherwise used to run the business. Not only did EM invest in office equipment such as computers, laptops, office furniture, printers, an ID making machine, and a postage machine, it also spent considerable funds on vehicles and other equipment used by its workers. For example, EM spent more than $400,000 on vehicles bearing its name and phone number, purchased trailers, lights, GPSs, radios, and generators for its workers use, and provided cones and signage for traffic workers who did not have their own.

This factor favors employee status.

## D.    Workers Opportunity for Profit or Loss

This factor asks whether the workers had "opportunities for profit or loss dependent on [their] managerial skill." *Off Duty Policy*, 915 F.3d at 1059. For example, a worker who uses his skill to improve efficiency and complete more jobs per day has an opportunity for profit based on

those skills. On the other hand, workers paid a set hourly wage regardless of their relative skill, have no such opportunity to control their opportunities for profit or loss. *Id.* (finding that where workers are required to be present for set periods of time regardless of what skills they exercised, they could not complete jobs more or less efficiently than their counterparts). Decreased pay from working fewer hours does not qualify as a loss. *Id.*

EM workers are paid based on the amount of time they work, or in the case of Puerto Rico workers, paid a flat daily rate whether working or not. While workers may sometimes be paid for hours not actually worked, this is a result of customer demand, not the worker's skill.

This factor also weighs in favor of employee status.

## E.    Degree of Control

The last factor looks at the degree of control the company exercised over the workers. The court considers whether the company "'retains the right to dictate the manner' of the worker's performance." *Off Duty Police*, 915 F.3d at 1060. In considering this factor, the Court finds it helpful to examine the local traffic control and security services separately from the security services provided in Puerto Rico.

### 1.   Local Traffic Control and Security Services

With regard to EM's control over local workers, Defendants argue, "With regard to EM's local workers, Plaintiff has no proof. And, the affidavits filed by EM confirmed that the local workers have autonomy." (Doc. No. 49 at 20). The affidavits in question are Declarations from two individuals who worked for EM locally, Danny Gentry and Al Lopez. (*See* Doc. Nos. 41-1 and 41-3). Gentry states that he provides security services for EM and that "EM does not control or otherwise govern the manner in which I provide my services. I exercise complete autonomy as to how I provide my services." (Doc. No. 41-3, ¶¶ 3, 6). The second worker, Al Lopez, does not make any statements regarding the level of control by EM. (Doc. No. 43-1). These conclusory

15

statements about autonomy in the Gentry Declaration add little to the analysis of the degree of control EM exerted over the workers.

The Secretary asserts that EM and Maasikas retained ultimate control over the workers' performance because they decided, based on customer requests, when and where to place the workers and retained the right to replace workers who did not perform adequately.

For large jobs, EM would designate certain workers to supervise the others, but otherwise there is no evidence that EM actively supervised the workers. The Secretary argues that the jobs performed by EM workers do not require much in terms of hands-on supervision. Indeed, in *Off Duty Police*, the court noted that "close supervision is not necessary to establish control" and "the level of supervision necessary in a given case is in part a function of the skills required to complete the work at issue." 915 F.3d at 1061. Traffic workers were supposed to keep people from going into closed roads or sidewalks or direct cars on a single lane road. Security guards, whether armed or unarmed, were supposed to stand in location to serve as a visual deterrent. The routine nature of the traffic and security work provided by EM, similar to that of the employees in *Off Duty Police*, does not require extensive supervision.

However, the evidence of control in this case is markedly less than that in *Off Duty Police*. In that case, the employer maintained a "policies and procedures" document, specified the type and color of uniform that must be worn, specified the type of vehicle that may be used and lights for the vehicle, rules for exchanging job assignments, and general rules for workplace presentation and conduct. *Off Duty Police*, 915 F.3d at 1061. In addition, the workers were required to sign non-compete agreements which prevented them from working for customers for two years after leaving the employer. *Id*. at 1060. As in this case, the workers generally followed the customers' instructions at the job site. *Id*. Unlike EM, however, the employer in *Off Duty Police* represented

to customers that it would inspect job sites and supervise its workers and, in fact, did so periodically. *Id*. at 1060-61.

Construing the facts in the light most favorable to Defendants, the Court finds this factor weights in favor of employee status. While EM did not actively supervise the workers, given the nature of the assignments, little supervision was necessary. When the assignments involved a larger group of workers, one of the workers was designated a supervisor. In addition, EM retained the right to remove workers for poor performance and did so on occasion. (Doc. No. 50, ¶¶ 75-77). In contrast, the workers themselves had little control over their work – everything from the hours to the specific tasks were dictated by the customer.

### 2. Puerto Rico

The workers in Puerto Rico had more supervision from EM. Erik Maasikas was in Puerto Rico to make sure the operation ran well, though it is not clear what he did, if anything, in terms of day to day supervision. The workers were supervised by Gary Stewart and Matt Tenbarge (also labeled independent contractors). T-Mobile determined what tasks were required and dictated the start and stop times of their shifts. Stewart communicated this information to the workers each day via a T-Mobile GPS system. In addition, EM provided airfare, transportation around the island, and lodging. While the workers could determine how to carry out their specific security tasks, the Secretary argues that most aspects of their work were not controlled by the workers, but by EM and T-Mobile.

Defendants argue that EM "did not exercise control regarding performance issues or day-to-day conduct in Puerto Rico" and that "each worker [was granted] autonomy as to the type of equipment they used and the manner in which they provided services." (Doc. No. 49 at 20). Defendants also argue that the fact that the hours and assignments were dictated by T-Mobile, not EM, evidences a lack of control over the workers by EM. (*Id*.).

17

The fact that T-Mobile, the customer, determined the scope of work to be performed, does not affect the analysis of control vis-à-vis the workers and EM. The evidence shows that while working for EM in Puerto Rico, the workers had no control over their schedules or work assignments, or even where they lived. Moreover, Defendants admit that assignments were dictated by T-Mobile and communicated to the workers through EM project managers. (Doc. No. 50, ¶ 127). The fact that the workers were required to supply their own firearm of choice and had limited autonomy regarding how to carry out their specified assignments, does not evidence lack of control on the part of EM. For these reasons, the Court finds this factor weighs in favor of finding employee status for the Puerto Rico workers.

**F.      Whether the Service is an Integral Part of the Business.**

This factor asks whether the services provided by the worker are integral to the company's business. "The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship." *Off Duty Police*, 915 F.3d at 1055 (quoting *Keller*, 781 F.3d at 815).

In this case, the workers provide the only service offered by EM. Accordingly, a reasonable jury would conclude that the workers are integral to EM's business. This factor weighs in favor of an employee relationship.

**G.      Additional Factors**

Defendants seek to add additional factors to the "economic reality" test, none of which have basis in law.

First, Defendants cite *Jammal v. Am. Fam. Ins. Co.*, 914 F.3d 449 (6th Cir. 2019) for the proposition that a verbal contract that labels the workers independent contractors is "relevant to the inquiry and shows how the parties themselves viewed the nature of their working relationship." (Doc. No. 49 at 21). Defendants add that the workers were viewed as independent contractors by

18

"everyone involved," including the Puerto Rican government that issued ID cards labeling the workers as "Contratistas," and the Department of Homeland Security, representatives of which were allegedly present at a Command Center where the workers registered their firearms and received the ID cards. (*Id.* at 22-23).

Defendants' reliance on *Jammal* is misplaced. *Jammal* considered whether a worker qualifies as an employee under the Employee Retirement Income Security Act of 1974 ("ERISA"), not the FLSA. *Id.* The definition of employee under ERISA is determined by application of common law agency principles, a more restrictive standard than is applicable to the definition of employee under the FLSA. *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (the "striking breadth" of the definition of employee under the FLSA includes some parties who would not qualify under traditional agency law principles). The more restrictive ERISA definition has no application here. *See id.* (rejecting application of the FLSA definition of employee in the ERISA context). Moreover, it is clear that whether a worker qualifies as an employee under the FLSA is determined without regard to the labels used.

Second, Defendants cite *Robinson v. KKC Holdings*, No. 19-2221-TLP, 2020 WL 7864398 (W.D. Tenn. Jun. 16, 2020) for the proposition that "the totality of the circumstances should take into account whether a worker reports their income as an employee or independent contractor." (Doc. No. 49 at 21-22). While the underlying claims in *Robinson* involved FLSA overtime claims, the cited Order holds only that the plaintiffs' tax returns are discoverable under the "low standard" of relevance for discovery. *Id*. The *Robinson* court noted that the information in the tax returns was by no means dispositive, as the FLSA has "an independent definition of what it means to be an employee." *Id*.

## H.      Balancing the Factors

With regard to the Puerto Rico workers, all of the factors favor finding that the workers were employees. The workers themselves were the only service offered by the business and were therefore integral to EM. The workers had a relatively low investment in equipment or materials compared to the capital investments by EM. The workers worked exclusively for EM for the duration of the project, and because they were paid based on a daily rate, they had no opportunity for profit or loss based on their skill. The only way to make more money was to work more days. While in Puerto Rico, they were supervised by EM, and told where to live, when and where to perform their security duties, and what duties were required. The fact that the workers preferred to be designated independent contractors and worked for other companies as independent contractors at other times has no bearing on the economic reality of their relationship with EM.

Accordingly, with regard to the workers in Puerto Rico, the Court finds there is no dispute of material fact that the workers are employees for purposes of the FLSA.

With regard to the domestic traffic control workers and security guards, the Court finds that there are competing inferences that make the determination with regard to these workers inappropriate for summary judgment. Although most of the factors weigh in favor of classification as employees, there is very limited evidence with regard to the permanence of their relationship with EM. Competing inferences may be drawn from the evidence in the record regarding this factor. As stated above, although some individuals worked for EM for many years, the inverse must also be true – some did not. Additionally, there is scant evidence regarding the frequency with which individuals worked for EM, allowing inferences to be drawn in either direction. Keeping in mind that the factors are considered "with an eye toward the ultimate question – [the worker's] economic dependence on or independence from the alleged employer," the Court finds

20

competing inferences can be drawn making this question inappropriate for resolution on summary judgment.

## IV.    CONCLUSION

For the reasons stated, the Secretary's Motion for Partial Summary Judgment will be **GRANTED** in part, as follows. The Court finds that the workers who performed security services in Puerto Rico are employees of Defendants. However, because competing inference may be drawn from the evidence regarding whether the domestic traffic control workers and security guards are employees, summary judgment is denied on this issue as to those workers.

Defendants do not dispute that if the workers are employees, EM and Erik Maasikas are employers with the meaning of Section 3(d) and 3(g) of the FLSA, 29 U.S.C. § 203(d) and (g). The Court finds Defendants are employers with regard to the Puerto Rico workers. With regard to the domestic traffic control workers and security guards, competing inferences remain regarding whether these workers are employees and therefore whether Defendants are employers of these workers.

There is no dispute that EM is an enterprise engaged in commerce within the meaning of Section 3(r) and/or 3(s)(l) of the FLSA, 29 U.S.C. § 203(r) and (s)(1). Accordingly, summary judgment is granted as to this issue.

An appropriate Order will enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE

21