# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JULIE A. SU, Acting Secretary of Labor, | ) | |
| United States Department of Labor,[1] | ) | |
| | ) | |
| Plaintiff, | ) | NO. 3:19-cv-00700 |
| | ) | |
| v. | ) | JUDGE CAMPBELL |
| | ) | |
| EM PROTECTIVE SERVICES LLC and | ) | |
| ERIK MAASIKAS, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Fed. R. Civ. P. 52(a)(1), the Court makes the following findings of fact and conclusions of law.

## I.       INTRODUCTION

Plaintiff, as Acting Secretary of Labor for the United States Department of Labor, filed this action against EM Protective Services LLC and Erik Maasikas for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. The Secretary seeks overtime and minimum-wage back wages, as well as liquidated damages and a permanent injunction against future violations. (Doc. Nos. 1, 31).

EM Protective Services LLC ("EM") provides private security and traffic control services to third parties. The Secretary asserts that EM misclassified its workers as independent contractors and failed to pay overtime and minimum wages as required by the FLSA. The workers for whom the Secretary seeks back wages generally fall into two categories: (1) workers who provided security and traffic control services in the Nashville, Tennessee metropolitan area

---

[1]      Julie Su became Acting Secretary of Labor on March 11, 2023, and is substituted as Plaintiff.

("Local Workers"); and (2) workers who provided security services in Puerto Rico after Hurricane Maria in 2017 ("Puerto Rico Workers"). On summary judgment, the Court determined that the Puerto Rico Workers were employees of Defendants during the relevant time period. (*See* Memorandum and Order, Doc. Nos. 56, 57).

The issues remaining for trial included: (1) the appropriate classification of the Local Workers; (2) whether Defendants are liable for overtime and/or minimum-wage back wages and in what amount; (3) if Defendants owe back wages, whether they are liable for liquidated damages; (4) whether Defendants violated the record keeping requirements of 29 U.S.C. §§ 211(c) and 215(a)(5) and 29 C.F.R. § 516; and (5) if Defendants violated the FLSA, whether those violations were willful. The Secretary also seeks a permanent injunction enjoining Defendants from violating 29 U.S.C. §§ 206, 207, 211(c), 215(a)(2), and 215(a)(5).

The claims were tried without a jury on July 5-8, 2022. Following the trial the Court ordered the parties to submit proposed findings of fact and conclusions of law addressing: (1) classification of Defendants' Nashville workers; (2) willfulness; (3) liquidated damages; and (4) wage calculations for the Puerto Rico employees. (Doc. No. 79). Because the Court's ruling on these issues affects the damages calculation with regard to the Nashville workers, the Court directed the parties not to include proposed wage calculations for these workers. (Doc. No. 79).

Now before the Court are the parties' proposed findings of fact and conclusions of law (Doc. Nos. 86, 87-1), which the Court has considered together with the trial record.[2]

---

[2] The trial transcript is electronically filed at Doc. No. 80 (Vol. I, July 5, 2022), Doc. No. 81 (Vol. II, July 6, 2022), Doc. No. 82 (Vol. III, July 7, 2023), and Doc. No. 83 (Vol. IV, July 8, 2023). The trial transcript is cited as "Vol. __ at [page]." The Secretary's trial exhibits are cited as "Pl. Ex. __." Defendants' trial exhibits are cited as "Def. Ex. __."

2

## II.    FINDINGS OF FACT

### A.  EM Protective Services LLC

EM was started by Erik Maasikas in 2010. (Vol. II at 129). EM provides traffic control and security services to third parties on a contract basis. EM's business is divided approximately 50/50 between security and traffic control, though the precise ratio varies depending on the season. (*Id*. at 11-12). As relevant to this case, EM's work is broadly divided into work performed in the Nashville metropolitan area, which includes security and traffic control, and security work performed in Puerto Rico following Hurricane Maria in 2017.

EM classifies all of its workers as independent contractors. (Vol. II at 15). Workers are paid either a flat hourly or daily rate. (*Id*. at 15, 29, 126-27). None of the workers are paid overtime. (*Id*. at 15). Maasikas based the business model, including the decision to classify the workers as independent contractors, on his experience moonlighting as a contract security officer while employed by the Metropolitan Nashville Police Department. (*Id*. at 132-133). He testified that he "just did the norm of Nashville" and did not consult any professionals regarding his decision to classify his workers as independent contractors. (*Id*. at 17). Defendants claim that until contacted by the Department of Labor regarding the issues raised in this case, no one had ever questioned the independent worker classification or requested overtime pay. Maasikas stated that he believed his operations were regulatorily compliant. (*Id*. at 150). Neither EM's accountant nor the Internal Revenue Service ("IRS"), which performed an audit before 2017, suggested otherwise. (*Id*.; Vol. IV at 18, 32).

### B.  Local Workers

At trial, the parties offered the testimony of ten people who have worked for EM in the Nashville, Tennessee area performing security and traffic control work for EM clients: Mark

Chapman, Christopher Trail, John Armstrong, Wesley Argo, Craig Curtis, Claude Daniel Gentry, Alfredo Lopez, Russell Bradshaw, Gary Stewart, and William Guthoerl. (*See* Vol I, Vol. II, Vol III).

EM's work in the Nashville, Tennessee area includes both security and traffic control services. Unless they are uniformed police officers, persons performing traffic control must be certified, and those performing security work must be licensed. (Vol. II at 19). Licensure as a security guard requires an 8-hour class for unarmed guards and a 16-hour class for armed guards. (*Id*. at 20-21). A security guard's sole duty is to serve as a "visual deterrent." (*Id*. at 22-23). The manager of a particular location determines where the security guard should stand to provide the requisite visual deterrent. (*Id*.). Minimal equipment is required for the security jobs – armed security guards provide their own firearm and all security guards must wear clothing to distinguish themselves as security. (*Id*. at 22).

Generally, security guards are not supervised by EM. (Vol. I at 68). However, on occasion, EM is contracted to provide security services for large events, such as the NFL Draft or the Music City Barbecue Festival. (Vol. II at 24). For these large events, EM may provide up to 40 workers. In these instances, one of the workers supervises and coordinates the others. (*Id*. at 25).

Traffic control workers must be certified flaggers. To be a certified flagger, the worker must complete a four-hour course or be a police officer. (*Id*. at 26). The tasks of a traffic control worker vary by the job. Sometimes the work is as simple as monitoring a road or sidewalk closure to make sure people do not drive or walk in the closed area. (*Id*. at 26-27). If a lane is closed on a road otherwise open to traffic, two workers will work together to regulate traffic. (*Id*.). Other jobs require lane or road closures during specified period due to blasting with

4

explosives. (Vol. I at 177). Larger jobs could include as many as ten workers. (Vol. II at 28). In those instances, the workers work together as a team and the construction company or whoever is overseeing the job will direct the workers where to go. (*Id*.).

Traffic control workers are required to wear a high visibility shirt, long pants, and closed toe shoes. (Vol. I at 27, 39). Some traffic control workers have their own signs and cones, but if they do not, EM will provide them. (Vol. II at 28).

Some jobs, primarily traffic control jobs, also require vehicles. Maasikas invested about $500,000 on a fleet of vehicles – including fifteen trucks and ten police-style vehicles. (Vol. II at 60-61). While most of the vehicles are used by workers for EM-contracted jobs, the fleet includes a "military hummer" that Maasikas says is usually parked at Nashville Shores for advertisement, not used for work. (*Id*. at 65). He bought it because it was just "cool to have." (*Id*. at 65). All of the vehicles are insured and maintained by EM. (*Id*. at 69).

William Guthoerl explained that, if requested by a client, vehicles were dispatched for specific jobs. (Vol. III at 234). For example, a client might request one vehicle and two flaggers. (*Id*.). Vehicles were equipped to fulfill the specific needs of the client – this might include a truck equipped with signs and cones or a marked vehicle with lights to meet specific Tennessee Department of Transportation ("TDOT") requirements. (*Id*. at 235-236).

Workers testified that they either used or regularly saw others using EM vehicles on the job. Mark Chapman suggested that the use of EM vehicles was a regular occurrence. (Vol. I at 24-25). "If you were doing a traffic job that required a vehicle, you would have a vehicle to drive that day." (*Id*. at 24). Chapman would generally keep the vehicle for the duration of the job, which could be a week, two weeks, or six months. (*Id*. at 25-26). Similarly, John Armstrong and Craig Curtis testified they frequently use EM vehicles. Armstrong said he regularly uses an EM-

owned 2017 Ford F150 truck with directional arrows and lights and has kept the truck at his house for two years. (Vol. I at 124-26). Craig Curtis stated that he has used an EM vehicle every day for the last five years and he always keeps the vehicle at his house. (*Id*. at 195-96).

Other workers used vehicles less frequently. Alfredo Lopez and Russell Bradshaw used EM vehicles, but not often. (Vol. III at 154, 171). Russell Bradshaw testified that he "rarely" used EM vehicles – usually only when his own vehicle was in the shop. (Vol. III at 171).

Christopher Trail stated he would occasionally use EM vehicles for traffic control work depending on the job. (*Id*. at 75-76). For example, if a job required an advance warning vehicle with lights, he would pick up an appropriate vehicle from EM to use on the job. (*Id*.). Sometimes, "not often at all," if the job site needed a vehicle for more than just one day, Trail would keep an EM vehicle overnight at his house. (*Id*. at 77). Trail also had his own vehicle equipped with lights and would sometimes use it for traffic control work. (*Id*. at 88). He said that he was not required to provide his own vehicle, but having one made it possible to work jobs requiring a vehicle if EM did not have any available. (*Id*. at 103).

Two of the workers primarily used only their own equipment. Wesley Argo said he saw other people using EM vehicles, but he only ever used his own vehicle, which he outfitted with lights for about forty dollars. (Vol. I at 155, 166). Danny Gentry has all of his own equipment, including a vehicle equipped with blue lights, cones, whistles, and signs. (Vol. III at 135). He said he never used EM vehicles, but often saw other workers using them. (*Id*. at 135-136).

Generally, Local Workers are not actively supervised by EM. However, Maasikas or Guthoerl or another EM worker visit the job sites to check up on the job and see how things are going. (Tr. Vol. I at 68, 80, 119, 150; Tr. Vol. II at 25). If a worker does not meet the expectations about the hours they are to work, or the client requests a worker be removed, EM

will remove them from the project. (*Id*. at 25-26, 31). Maasikas testified that if workers regularly left early, he would not offer them additional work. (*Id*. at 33).

Local Workers appear to have discretion about when and where they work. EM contacts them by telephone or text to inform them about available job assignments and workers then accept or reject assignments at their discretion. (*See* e.g., Vol. I at 16, 65, 147) If a job assignment offer is accepted, EM provides the location, start time, and some general information about the position. (*Id*.). Some assignments, particularly those that lasted more than one day, would have set hours, but often EM only provided the start time, and the business would tell the workers when they could leave for the day. (Vol. II at 30-31). The Local Workers uniformly testified that they liked the arrangement with EM because it allows them to set their own schedules by accepting or rejecting job offers depending on their availability and interest.

EM pays Local Workers a flat hourly rate ranging from $18 to $30. (Vol. I at 134, 165; Vol. III at 124-25). EM does not pay overtime wages to workers who work more than forty hours in a week. (Vol. II at 15). However, workers are paid for a minimum of four hours per job regardless of the number of hours worked. (*Id*. at 145-46). Under this system, if a worker works two jobs in a day, he or she is paid for at least eight hours even though the actual number of hours worked might be less. (*Id*.). If a worker is assigned to three different jobs in one day, even if each job lasted only one hour, he or she is paid for twelve hours. On the other hand, if someone worked five ten-hour shifts, they were paid their regular hourly rate for fifty hours.

Requests for payment for jobs worked was made via a Google form set up by EM for that purpose. (*Id*. at 41). At the end of each day worked, workers input their name, the date, the client name, and the hours worked. (Vol I at 19-20). It was an imperfect system. Maasikas testified that the time entries often contain inaccuracies due to input errors and he does not correct them. (Vol.

7

II at 144-45). Most employees testified that the Google record did not accurately reflect the actual time worked because they would enter four hours to reflect the minimum guaranteed pay even if they worked less than four hours. (*See e.g.*, Vol. I at 105-06, 108). But there are also time entries for less than four hours. (Vol. III at 151-152, Ex. 11).

During the last five years, on average, 125 people per year worked for EM. (Tr. Vol. II at 15). The testifying workers have worked for EM for varying lengths of time – some more than 10 years. (Vol I at 10, 111, 174; Tr. Vol. II at 34; Vol. III at 142-43, 149, 193). All but two of these workers, Wesley Argo and Alfredo Lopez, worked for EM for more than five years. Wesley Argo worked full-time for EM from July 2017 to May 2018. Alfredo Lopez worked for EM from 2018 to 2021, and, at the time of trial had returned to work for EM. (Vol. III 142-43, 149). The other testifying workers worked for EM for times ranging from five years (Mark Chapman, John Armstrong) up to ten years or more (Craig Curtis, Gary Stewart). (Vol I at 10, 111, 174; Vol. III at 193).

Some witnesses worked for EM full-time as their sole source of income; others had different primary pursuits and worked for EM when their schedules allowed. John Armstrong said he has worked for EM full-time about 40-45 hours per week since 2017. (Vol. I at 112). Wesley Argo said that he was working 40-60 hours a week at times, but that EM was never his sole source of income. (*Id*. at 143).

Christopher Trail worked for EM from 2016 through 2021. (Vol. I at 58). At times, he worked for EM full-time as his sole source of income. (*Id*. at 60). While he was working for EM, Trail set up his own security contract company, Mid-South Protection. (*Id*. at 86). Although Mid-South Protection did not do any jobs while Trail was working for EM, he said that EM knew

about his company and did not have any problems with him pursuing other security work. (*Id*. at 82, 87).

Mark Chapman worked for EM from approximately 2014 through 2020 performing traffic control and armed security work. (Vol. I at 10). At times, the work was full-time and his sole source of income. (*Id*. at 11). In the summer he worked as many as 55 to 60 hours per week. (*Id*. at 12). During the winter months, he worked less – 20 to 50 hours per week. (*Id*.).

Others had various primary pursuits and picked up jobs from EM when their schedules allowed. For example, Craig Curtis is a musician. He likes to choose jobs where he will be done by 3 p.m. and frequently does not accept any EM jobs in the summer or on long weekends when he is traveling for his music career.

Danny Gentry stated that he worked for EM "on occasion" – "If I want to work, I'll work." (Vol. III at 122-23). In 2017, 2018, and 2019 he worked for EM about ten months of each year, but also worked for other companies. (*Id*. at 134).

Alfredo Lopez started working for EM from 2018 to 2021 when he was on active duty in the Army and sometimes also worked for other companies doing the same type of work. (*Id*. at 142-43). At the time of trial, he had resumed work for EM. (*Id*. at 149).

Russell Bradshaw, who was a reserve deputy for a local sheriff's department and serves as a volunteer firefighter, has worked for EM since 2010 (except for two years when he worked for a local hospital). (*Id*. at 158). Gary Stewart began working for EM in 2016 or 2017. He has done security work for companies other than EM. (*Id*. at 179). Bradshaw and Stewart both worked on the Puerto Rico project in 2017. (*Id*. at 160, 180).

William Guthoerl has worked with EM since 2010 and has served as chief executive officer since 2017. (*Id*. at 212-15). Guthoerl has been a deputy sheriff for Hickman County,

Tennessee, for the past eleven years. (*Id*. 212-13). In addition to his work with EM, for the past six years he has worked with another company that provides contract security services by assisting with hiring and scheduling security guards and off-duty police officers. (*Id*. at 213).

## C. The Puerto Rico Project

From September through December 2017, EM provided security services in Puerto Rico for T-Mobile, which was working to restore cellular service in the aftermath of Hurricane Maria. (Vol. II at 81-82). The work performed by EM workers in Puerto Rico is set forth in detail in the Court's August 9, 2021 Memorandum (Doc. No. 56). The Court's findings of fact regarding the Puerto Rico Workers are limited to those necessary to decide the amounts due in overtime and/or minimum wages.

EM was a subcontractor for USIA, which in turn was a subcontractor for Picore, which in turn contracted directly with T-Mobile. (Vol. II at 83). EM promised workers $400 per day they they had "boots on the ground" in Puerto Rico regardless of how many hours they worked each day. (*Id*. at 92). Three workers – Russell Bradshaw, Gary Stewart, and Chase Sanders – received a higher daily rate because they were running the project and coordinating with T-Mobile. (*Id*.).

EM started with a twelve-man team, who arrived between September 23 and 26, 2017, and eventually had 48 workers in Puerto Rico. (Vol. I at 84-85; Pl. Ex. 3). Most of the workers arrived in early October and left in mid-December. (*See* Pl. Ex. 3).

The workers were classified as independent contractors. and issued 1099s, which Defendants state reflect payments made by cash, check, or wire transfer. (Vol. I at 92-93). Although there appears to be agreement that the workers were paid $400 per day, the 1099s may not all accurately reflect these amounts. Some of the 1099s show amounts not divisible by 400, and there are discrepancies between EM's records of when workers were on the island and the

10

amount of payment reflected in the 1099. (*Id*. at 93-95; *see* Ex. 5). Maasikas explained that the 1099s might not all reflect $400 a day because at the beginning of the project, there was an issue getting money into Puerto Rico and he advanced some people money for gas or other expenses. (Vol. II at 95).

The testimony at trial and through designated depositions was directed at determining how much the Puerto Rico Workers were working each week. EM did not track hours for the workers in Puerto Rico, and the answer proved difficult to ascertain with any certainty.

Maasikas admitted that individuals could have worked as many as 14 hours in a day. (*Id*. at 99). In the early days of the project, he sent emails to USIA reporting hours for the initial team of workers. (Pl. Ex. 12). He wrote that Russell Bradshaw and Matt Tenbarge worked from September 23, 2017, at 3:00 p.m., to September 24, 2017, at 9:00 p.m. – a total of 30 hours each. (*Id*.). He also reported hours for twelve workers, including himself, on September 26, 2017, as follows:

Erik Maasikas – 15 hours
Dan Scager – 12 hours
Ken Hall – 12 hours
Jason Burns – 12 hours
Travis Joyer – 13 hours
Dakota Jones – 12 hours
Sean Webb – 12 hours
Ricardo Pequa – 12 hours
Josh Parker – 12 hours
Tyler Negri – 12 hours
Russell Bradshaw – 17 hours
Matt Tenbarge – 17 hours

(Pl. Ex. 15). Maasikas testified that the email did not reflect actual time worked; he said he reported as least 12 hours worked because they company with whom he contracted mandated it. (*Id*. at 126). Invoices sent from USIA to Picore for work by EM workers on September 29, 2017, bill 12 to 18 hours per person. (Pl. Ex. 18).

To establish the number of hours worked during the remainder of the project, the Secretary submitted the deposition testimony of five workers: Timothy Burns, Hector Gonzalez, Orlando Rivery, Alan Kay, and Timothy Sante. Defendants relied on portions of this testimony and also submitted the deposition testimony of Garland Slater. (Pl. Ex. 39; Def. Ex. 25). In addition, Russell Bradshaw and Gary Stewart, who worked in Nashville and in Puerto Rico, testified in-person at trial. (*See* Vol. III).

Timothy Burns testified that he worked in Puerto Rico for just over two months from October 10, 2017, to December 15, 2017, with four or five days off around Thanksgiving, and that he typically worked every day from 6:30 a.m. until after 7:00 p.m. (Pl. Ex. 39A/Def. Ex. 25D at 33-34, 37, 57, 71).

Orlando Rivery worked for EM in Puerto Rico for a little over two months. (Pl. Ex. 39D/Def. Ex. 25A at 13-14). He was told he would be working 12-hour shifts seven days a week for $400 per week; he found the work schedule was consistent with these representations. (*Id*. at 14, 16).

Alan Kay testified that he did not keep track of his hours, but estimates that he worked anywhere from eight to 16 hours a day all but six days he was in Puerto Rico. (Pl. Ex. 39C/Def. Ex. 25F at 25, 30, 70).

Timothy Sante kept track of "days on the ground" and when and how much he was paid. (Pl. Ex. 39E/Def. Ex. 25B at 18-19; Sante Dep. Ex. 1). Based on his records, he was in Puerto Rico for 75 days from October 5, 2017, to December 18, 2017, and was paid $400 per day for a total of $30,000. (*Id*. at Sante Dep. Ex. 1). Sante said he worked seven days a week from 6:00 or 6:30 a.m. until either around 5:00 p.m. or as late as 9:00 p.m., depending on where they were working. (*Id*. at 26-29).

Garland Slater testified that, other than the first week, he does not remember working any excessively long days. (Def. Ex. 25E at 88-89). He said that they purposely avoided working after sundown due to safety concerns and would typically work during daylight hours – usually from 7:00 a.m. to 4:00 or 5:00 p.m. and that he worked five or six days a week. (*Id*.).

Russell Bradshaw and Gary Stewart worked as managers in Puerto Rico. Bradshaw did not remember the precise dates he was in Puerto Rico, but estimates it was just over one hundred days. (Vol. III at 162). He said that when they first arrived on the island, they worked more than twelve hours a day, but that after the first couple of days they had electricity and more people on the ground and the days were not as long. (*Id*. at 163). There were days when he did not work. (*Id*. at 172).

Gary Stewart acknowledges that he did not keep records of the hours or days the EM workers in Puerto Rico worked. (*Id*.at 193). He testified that there were individuals who did not work seven days a week, twelve hours a day, and that it was "pretty common" for individuals to work six days or less per week. (*Id*. at 187). Stewart said most of the workers had Sundays off, but not always. (*Id*. at 200). He confirmed that between 8 and 16 employees worked 12-hour shifts guarding stationary locations 24 hours a day, seven days a week. (*Id*. at 194). In addition, four workers covered headquarters in 12-hours shifts, seven days a week. (*Id*. at 195). After EM had been operating in Puerto Rico for about a month, they adjusted schedules so people could have a day off, but it is not clear how regularly the 12-hour shift workers were given a day off. (*Id*. at 196-97).

Hector Gonzalez claims he was not paid the agreed $400 per day. Gonzalez worked in Puerto Rico for about 15 days from around October 3, 2017, to October 18, 2017. (Pl. Ex. 39B/Def. Ex. 25C at 18, 31). Before he started, he was told he would work 12-hour shifts, seven

day a week. (*Id*. at 42). He testified that he and another worker guarded a location called "the Switch," each working a 12-hour shift. (Pl. Ex. 39B/Def. Ex. 25C at 48-49). He left Puerto Rico early for personal reasons. (*Id*. at 20). On October 27, 2017, EM issued Gonzalez an "Invoice" indicating that he was owed $4,600 and that he was being "charged" $2,000 for the cost of his plane ticket to Puerto Rico and as a penalty for "violating verbal contract and deserting post." (Pl. Ex. 17). Gonzalez testified that he received a check for $2,600, and that he received approximately $1,500 in cash at an earlier date. (Pl. Ex. 39B/Def. Ex. 25C at 27-29).

**D. The Department of Labor Investigation**

The Department of Labor began investigating EM in late November 2017 following Hector Gonzalez's complaint about the deductions from his wages. (Vol. II at 6, 170). In November and December 2017, the investigator requested records from EM including records of payments made to independent contractors and contact information of all independent contractors. (Pl. Ex. 34, 35). EM did not provide all of the requested documents. (Vol. II at 176, 181).

By June 2018, after receiving an administrative subpoena directing production of the records requested in the first two letters, EM produced what the investigator described as "very spotty time records," and 1099 forms for 22 of the Puerto Rico workers. (*Id*. at 185-86). The investigator explained that it was unusual for an employer to take six months to produce records. (Vol. II at 188). He said it took so long because EM was arguing that the workers were 1099 independent contractors, that the FLSA regulations governing employees did not apply, and that EM should not have to produce the requested records. (*Id*. at 184, 188). In August 2018, the investigator held a final conference with EM explaining that he found them to be in violation of the FLSA. (Vol. II at 194-95).

14

### III.    CONCLUSIONS OF LAW

The questions for the Court are: (1) the appropriate classification of the Local Workers; (2) whether Defendants are liable for overtime and/or minimum-wage back wages and in what amount; (3) if Defendants owe back wages, whether they are liable for liquidated damages; (4) whether Defendants violated the record keeping requirements of 29 U.S.C. §§ 211(c) and 215(a)(5) and 29 C.F.R. § 516; and (5) if Defendants violated the FLSA, whether those violations were willful. The Secretary also seeks a permanent injunction enjoining Defendants from violating 29 U.S.C. §§ 206, 207, 211(c), 215(a)(2), and 215(a)(5).

### A.   Classification of the Local Workers

The question before the Court is whether the Local Workers, though labeled as independent contractors, are, as a matter of "economic reality," employees under the FLSA. The FLSA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "Employ" is defined as "suffer or permit to work." 29 U.S.C. § 203(g). "The definition of 'employee' in this context is 'strikingly broad' and includes 'some parties who might not qualify as such under a strict application of agency law principles.'" *Acosta v. Off Duty Police Svcs.*, 915 F.3d 1050, 1055 (6th Cir. 2019) (quoting *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 804 (6th Cir. 2015)).

To determine whether a worker is an "employee" under the FLSA, the Court disregards the labels attached to the worker and instead looks to see whether the worker is, as a matter of "economic reality," an "employee." *Id*. The economic reality test considers six factors, none of which is determinative. *Id*. Each of the factors is considered "with an eye toward the ultimate question – [the worker's] economic dependence on or independence from the alleged employer." *Id*. (quoting *Keller*, 781 F.3d at 804). The test "looks to whether the putative employee is

15

economically dependent upon the principal [for work] or is instead in business for himself. This test is a loose formulation, leaving the determination of employment status to case-by-case resolution based on the totality of the circumstances." *Lilley v. BTM Corp.*, 958 F.2d 746, 750 (6th Cir. 1992) (internal citations omitted).

The six factors are: (1) the permanency of the relationship between the parties; (2) the degree of skill required for the rendering of the services; (3) the worker's investment in equipment or materials for the task; (4) the worker's opportunity for profit or loss, depending upon their skill; (5) the degree of the alleged employer's right to control the manner in which the work is performed; and (6) whether the service rendered is an integral part of the alleged employer's business. *Off Duty Police*, 915 F.3d at 1055 (citing *Keller*, 781 F.3d at 807).

As an initial matter, the Court notes that although Defendants presented testimony that the workers agreed to work as independent contractors and preferred to work as independent contractors, whether the workers agreed to work as independent contractors is not relevant to the determination of whether they are employees under the FLSA. *See Keller*, 781 F.3d at 808 (holding that the existence of a contract is irrelevant because "the FLSA is designed to defeat rather than implement contractual arrangements"); *see also*, *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981) (holding FLSA rights cannot be abridged by contract or otherwise waived). In addition, although the workers appear to equate being an independent contractor with the ability to choose which assignments to accept, this too is a false paradigm. Nothing in the FLSA requires an employer to force employees to work a specific schedule, to work a set number of hours, or to take assignments that they do not want to take.

1. Permanency of the Relationship

16

"Generally, independent contractors have variable or impermanent working relationships with the principal company because 'they often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work for only one employer and such relationship is continuous and indefinite in duration.'" *Keller*, 781 F.3d at 807. However, exclusivity is not necessarily required. *Off Duty Police*, 915 F.3d at 1057. An employee could work multiple part-time jobs on a regular basis and does not lose benefits under the FLSA by working for more than one employer. *Id.* "Schedule variability can serve as an indicator of independent-contractor status; however, 'workers have been deemed employees where the lack of permanence is due to operational characteristics intrinsic to the industry rather than to the workers' own business initiative.'" *Keller*, 781 F.3d at 808 (citing *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988)).

Though some EM workers worked exclusively for EM, the testimony at trial indicates that EM did not require exclusivity, nor did it require workers to work a full schedule such that they would be unable to work for anyone else. Several workers testified that they worked for different companies providing similar services.

However, while the individual jobs performed were, for the most part, limited in duration, the evidence shows a degree of permanency in the relationship between EM and the workers suggestive of an employer/employee relationship. Virtually all of the workers who testified had been working regularly for EM for years, in most cases five years or more. For some of the workers, EM was their sole source of income. On balance, the duration of the relationship between EM and the workers weighs in favor of an employment relationship.

2. <u>Degree of Skill</u>

This factor assesses the complexity of the work performed, how the worker acquired their skill, and the length of the worker's training period. *See Off Duty Police*, 915 F.3d at 1055-56. "Every worker has and uses relevant skills to perform his or her job, but not everyone is an independent contractor." *Keller*, 781 F.3d at 809. The Court considers the type of skill, the degree of training required, whether the training was provided by the company, and whether a worker's skill affects their efficiency or degree of success. *Id*.

Testimony at trial was that training to be a flagger or security guard is relatively minimal – 4 hours for traffic control and 8 to 16 hours for security guards. Uniformed police officers have far more training, but the security and traffic control jobs do not require it, and most of the workers for EM are not police officers. Maasikas testified that with respect to both armed and unarmed security guards, their task was to be a visual deterrent and nothing more. He further testified that traffic control workers perform various tasks related to directing the flow of traffic. The workers who were called to testify confirmed this description of their work.

While not diminishing the work ethic or importance of this workforce, the tasks the workers performed are relatively simple and require relatively little in terms of training. In addition, there is no evidence that particular workers were requested for jobs because of their level of skill. This Court finds this factor demonstrates that the workers are employees.

3.  Worker's Investment in Equipment

"This factor compares the worker's total investment in the company to 'the company's total investment, including office rental space, advertising, software, phone systems, or insurance' and 'is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered.'" *Gilbo v. Agment, LLC*, 831 F. App'x 772, 776 (6th Cir. 2020) (citing *Keller*, 781 F.3d at 810). The Sixth Circuit has cautioned that "[w]hen

18

considering the worker's capital investment in the equipment needed to perform his job, we must consider those investments in light of the broader question: whether that capital investment is evidence of economic independence." *Keller*, 781 F.3d at 810. For example, capital investments such as vehicles "do not necessarily evidence economic independence" because most drivers also use the vehicle for personal purposes. *Id*.

The evidence at trial shows that EM and Maasikas' investments in the company far exceeded those of the individual workers. Maasikas testified that he had invested over $500,000 in vehicles used by the workers. The vehicles are branded with EM's name and logo and some are outfitted with specialized equipment. In addition to the vehicles, EM invested in multiple guns, lights, tasers, radios, office furniture, a computer, and a message board. (*See* Pl. Ex. 19, 20, 21). Maasikas also testified that, EM has all of the traffic signs and cones necessary for the traffic control workers to perform their jobs. (Vol. II at 28).

In comparison, the investments by workers are relatively minor. Workers testified that they were required to provide personal equipment, including appropriate clothing and, for armed guards, a firearm. Some workers testified that they had their own traffic signs or used their own vehicles.

On balance, EM's investments in equipment far exceeds those of any individual worker. EM's expenses are consistent with those of a business, while the individual worker's expenses are generally consistent with those of an employee. This factor also favors employee status.

4.   Opportunity for Profit or Loss

This factor asks whether the workers had "opportunities for profit or loss dependent on [their] managerial skill." *Off Duty Police*, 915 F.3d at 1059. For example, a worker who uses his skill to improve efficiency and complete more jobs per day has an opportunity for profit based on

those skills. *Id*. On the other hand, workers paid a set hourly wage regardless of their relative skill, have no such opportunity to control their opportunities for profit or loss. *Id*. (finding that where workers are required to be present for set periods of time regardless of what skills they exercised, they could not complete jobs more or less efficiently than their counterparts). Decreased pay from working fewer hours does not qualify as a loss. *Id*.

EM workers are paid based on the amount of time they work. While workers may sometimes be paid for hours not actually worked, this is a result of client demand, not the worker's skill. This factor also weighs in favor of employee status.

    5.  <u>Employer's Right to Control the Manner of Work</u>

The last factor looks at the degree of control the company exercised over the workers. The court considers whether the company "'retains the right to dictate the manner' of the worker's performance." *Off Duty Police*, 915 F.3d at 1060. As the Sixth Circuit noted in *Peno Trucking v. Comm'r of Internal Revenue*, "[t]he absence of need to control should not be confused with the absence of right to control," and the actual exercise of control "requires only such supervision as the nature of the work requires." 296 F. App'x 449, 456 (6th Cir. 2008) (internal quotation marks omitted) (quoting *McGuire v. United States*, 349 F.2d 644, 646 (9th Cir. 1965)); *see also Donovan v. Brandel*, 736 F.2d 1114, 1119 (6th Cir. 1984) (noting that the control test asks whether a company "retains the right to dictate the manner" in which the worker performs).

The actual control EM asserts over workers varies by project. Generally, for small projects with only a single worker, control over the worker is largely left to the direction of the client – they tell security guards where to stand and direct the traffic control workers based on the needs of the project. On larger jobs where there are several EM workers, Guthoerl or

someone else from EM will supervise and coordinate the others. Maasikas, testified, however, that that EM retains the right to replace a worker on any project. (Vol. II at 25-26, 29, 31). In addition, EM tells the worker when and where the project begins and the client dictates the time the job ends. If a worker does not meet the expectations about the hours they are to work, EM will remove them from the project. (*Id*. at 31). Maasikas testified that if workers regularly left early, he would not offer them additional work. (*Id*. at 33).

Defendants argue that the workers testified that they have discretion as to how they perform their services. (Doc. No. 86 at 18-19). This may be true to an extent, but the workers' discretion is naturally limited by the nature of the work. In fact, Maasikas agreed that the workers "have fairly limited discretion on how they perform" what are "all fairly simple tasks." (Vol. II at 27).

On balance, though the control is less than one might see in a more conventional employer relationship, given the nature of the assignments, little supervision was necessary. This factor weighs in favor of an employee-employer relationship.

6. Integral Part of the Employer's Business

This factor asks whether the services provided by the worker are integral to the company's business. *Off Duty Police*, 915 F.3d at 1055. "The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship." *Id*. (citation omitted). Here, all of the work done by EM Protective is done through its workers. The services provided by the worker could not be more integral to EM's business. Accordingly, this factor weighs heavily toward employee status.

All of the factors weigh in favor of classification of the Local Workers as employees. In reaching a conclusion about the appropriate classification of the Local Workers, the Court

considers the factors discussed above, mindful that the ultimate question is the worker's "economic dependence on or independence from the alleged employer." The Court finds the Local Workers are employees of EM, and EM is an employer within the meaning of the meaning FSLA.

## B. Record Keeping

Section 11(c) of the FLSA requires employers to make and preserve employment records, including records of hours worked each workday and each workweek, the regular hourly pay rate for any week when overtime is worked, total daily straight-time earnings, and total overtime pay for the workweek. 29 U.S.C. § 211(c). "Regulations require payroll records to be kept for a period of three years, and time sheets for two years." *U.S. Dep't of Labor v. Cole Enter.*, 62 F.3d 775, 779 (6th Cir. 1995) (citing 29 C.F.R. §§ 516.5(a), 516.6(a)(1)). The Sixth Circuit has recognized that "[t]he responsibility for maintaining accurate records ... falls on the employer." *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 878-79 (6th Cir. 2012).

There is no dispute that EM did not keep records of the hours or days worked by the Puerto Rico Workers. This is a violation of Section 11(c) of the FLSA, 29 U.S.C. § 211(c). The Secretary has not argued that EM violated the record keeping requirement with regard to the Local Workers, and the Court makes no findings in this regard.

## C. Back Wages for the Puerto Rico Workers

The Court previously determined that EM is an employer, and the Puerto Rico Workers are employees within the meaning of the meaning of Section 3(d) and 3(g) of the FLSA, 29 U.S.C. § 203(d) and (g). (*See* Memorandum and Order, Doc. Nos. 57, 58). The FLSA requires employers to pay employees overtime wages at a rate of at least one and one-half times the regular rate for all hours worked in excess of forty hours in a work week. 29 U.S.C. §§ 207(a)(1).

22

In cases where an "employer's records are inaccurate or inadequate … an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Cole Enter*., 62 F.3d at 779 (quoting *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680, 687 (1946)). Once the employee makes this showing, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id*.

The Secretary seeks back wages for the Puerto Rico Workers based on the assumption that they worked 12 hours per day, seven days per week during their time on the island. (*See* Doc. No. 87-1 at 19). Because Defendants did not maintain records of days and hours worked in Puerto Rico, the Secretary need only produce sufficient evidence to show the amount of work as a matter of just and reasonable inference.

The Secretary points to emails sent from EM to USIA reporting that more than 12 hours worked per person, per day during the first three days of the project – September 24-26, 2017. (*See* Exs. 12, 13, 14, 15). The testimony at trial showed that, during the remainder of the project, approximately 20 workers worked 12-hour shifts, seven days a week guarding stationary locations and covering headquarters. Two of the workers who were assigned to guard stationary locations, Gonzalez and Rivery, testified that they worked 12 hours per day, seven days per week. The testimony of the other workers was that they did not always work 12 hours a day – sometimes they worked more, sometimes less. Maasikas admitted that individuals could have worked as many as 14 hours in a day.

As evidence that all of the Puerto Rico workers worked seven days a week without any days off, the Secretary points to evidence that the stationary locations were guarded 24 hours a day, seven days a week and the testimony of Burns, Sante, Kay, Rivery, and Gonzalez that the standard work week was seven days. The Secretary acknowledges that some of the workers testified that they had days off but argues that this testimony should be afforded less weight because two of the workers who testified they had days off, Stewart and Bradshaw, are longtime associates of Maasikas and EM Protective and because their testimony was inconsistent about exactly how often they had days off.

Defendants argue the Secretary's proposed calculations overstate the number of hours worked based solely on reports of hours worked by a handful of people during the initial days on the project when work hours were longer than usual. Defendants add that the testimony from Kay, Slater, Bradshaw, Stewart, and Burns is that the workers did not all work 12 hours a day, seven days a week for the duration of the project. (Doc. No. 86 at 27-32).

The testimony shows that some of the Puerto Rico Workers likely worked a regular 12-hour a day, seven day a week schedule, perhaps with a few days off. Others, however worked hours that varied based on the tasks at hand. Sometimes the days were eight hours, but sometimes they were much longer. The number of days worked per week also appears to have varied from worker to worker. Some unequivocally testified that they worked seven days a week. Others testified that they "did not always" work seven days per week, suggesting that sometimes they did, sometimes they did not. While the field workers did, undoubtedly, have some days off, the evidence also does not suggest that they regularly worked a six-day week. EM did not keep time records, so it is impossible to establish the precise amount of time worked.

The Court finds that the Secretary has produced sufficient evidence from which to reasonably infer that the Puerto Rico workers worked 12 hours per day, seven days per week, which is 84 hours per week. Any overstating of the number of days worked is offset by the fact that some workdays were longer than 12 hours.

1. Overtime

Section 7 of the FLSA, the overtime provision, requires covered employers to pay their employees "at a rate not less than one and one-half times the regular rate at which [they are] employed" for any hours worked in excess of 40 hours per week. 29 U.S.C. § 207(a)(1). The purpose of the overtime provision is to spread employment by imposing an overtime pay requirement on employers and to compensate employees for the burden of working a workweek in excess of hours fixed by the statute. *Jewell Ridge Coal Corp. v. Local No. 6167*, 325 U.S. 161 (1945); *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446 (1948). Because the Secretary's estimate of employees working an average of 12 hours a day is reasonable, a worker is owed overtime for any workweek in which he worked at least four, 12-hour days.

To calculate the overtime owed to the employees in Puerto Rico, the Court must determine the employee's regular rate. The "regular rate" includes "all remuneration for employment paid to … the employee," apart from eight categories of payment not at issue here. 29 U.S.C. § 207(e). "While the words 'regular rate' are not defined in the Act, they obviously mean the hourly rate actually paid for the normal, non-overtime workweek." *Walling v. Helmerich & Payne*, 323 U.S. 37, 40 (1944). When determining the regular rate, courts are "required to look beyond that which the parties have purported to do," as the regular rate is an "actual fact." *149 Madison Ave. Corp. v. Asselta*, 331 U.S. 199, 204 (1947).

At trial, EM Protective produced an exhibit with the calculation of overtime based on various assumed rates. (*See* Def. Ex. 9). Since none of these assumed rates reflect what the employees were actually paid, they are not helpful to the calculation of overtime in this manner. It would be an error to calculate overtime based on assumed rate of $20/hour or $25/hour when the evidence is that the employees were paid on a different basis.

Investigator Gray testified at trial how he determined the amount of overtime due to each employee. To determine the employee's regular rate, where available, he took the amount shown on the employee's 1099 (Pl. Ex. 7) and divided it by number of days the employee was in Puerto Rico, as listed on the Puerto Rico roster (Pl. Ex. 3). This calculation determined the employee's true "day rate." For instance, Jason Burns is one employee listed on the Puerto Rico roster. Jason Burns's Form 1099 shows that he was paid $12,780 in total. (*See* Pl. Ex. 5 at 44). The Puerto Rico Roster shows Jason Burns worked from September 24, 2017, through November 23, 2017. (Pl. Ex. 3). This is a period of 61 days. Taking the total compensation paid to Burns of $12,780 ÷ 61 days on the island = $209.51/day.

Next, Investigator Gray determined the employees' regular hourly rate. "The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid." 29 C.F.R. § 778.109. Sticking with the example of Jason Burns above, in seven days, he earned $1,466.57 (7 days x $209.51/day). To calculate Burns's hourly rate, his total weekly compensation is divided by the total number of hours worked. In a seven-day work week, he worked 84 hours (7 days x 12 hours). His hourly rate, then, is $17.46/hour ($1,466.57 ÷ 84 hours = $17.46/hour). This number is Burns's "regular hourly rate."

The FLSA requires employees to receive one-and-one-half times their regular rates of pay for hours worked in excess of 40 in a workweek. *See* 29 U.S.C. § 207(a)(1). If Burns worked 84 hours in a week, 44 of those hours were "overtime hours," and he would be owed an additional "half time" for those hours. Half of Burns's regular rate is $8.73 ($17.46 ÷ 2). Thus, in a week where he worked all seven days, Burns would be owed an additional $384.12 in overtime compensation ($8.73 x 44 hours). The Secretary made these overtime calculations for each of the Puerto Rico employees in Plaintiff's Exhibit 1 for every workweek that they were in Puerto Rico.

The Secretary's method for calculating the overtime owed to workers in Puerto Rico was reasonable and, as demonstrated below, conservative. EM Protective has insisted that the employees were paid $400 per day. In this case, for the example of Jason Burns, above, if the Secretary calculated Burns at $400/day, Burns would be owed more per week than the Secretary calculated. If Burns were compensated at a rate of $400/day, his weekly total would be $2,800 per 7-day week (7 days x $400/day= $2,800). At the same 84 hours per week, Burns's hourly rate would be $33.34/hour ($2,800 ÷ 84 hours = $33.34/hour). Half of his regular rate would be $16.67 ($33.34 ÷ 2). For a week where Burns worked 84 hours, 44 of those hours are overtime, for which Burns would be owed an additional half-time. Thus, assuming that Burns was paid $400/day, Burns would be owed an additional $733.48 in weeks where he worked all seven days ($16.67/hour x 44 hours= $733.48).

Assuming the employee earned $400 per day would also create a discrepancy between the amount reported by the EM Protective on the 1099 for the employee and the number of days that EM Protective said the employee was in Puerto Rico. For Burns, this would amount to an underreported $190.49/day.[3]

---

[3]     One of the following must be true about EM Protective's payment to the workers in Puerto Rico: either (1) the 1099s do not correctly reflect how much the employee was compensated; (2) the Puerto

As discussed above, while the employees in Puerto Rico undoubtedly had some days off, there is no way to quantify those days accurately, while also accounting for the fact that some days were worked in excess of 12 hours. For the sake of discussion, though, assume that an employee worked 72 hours in a week rather than 84. The employee's hourly rate would still be calculated based on his total weekly remuneration, even if he were paid for a day that he did not work. Sticking with the example of Jason Burns, had Burns worked 72 hours (rather than 84), his hourly rate would be $20.37/hour ($1,466.57 ÷ 72 hours). Burns would then be owed an additional half time on 32 hours at that rate, which would amount to an additional $732.96. The difference between the amount owed using the 72 hour a week calculation ($732.96) and the 84 hour a week calculation ($733.48) is 52 cents.

2. <u>Minimum Wage</u>

Section 6 of the FLSA, the minimum wage provision, requires covered employees to be paid at least $7.25 per hour. 29 U.S.C. § 206(a)(1)(C).

The Secretary submitted the deposition testimony of Hector Gonzalez. (Pl. Ex. 39B). Gonzalez testified that he was paid $1,500 in cash while in Puerto Rico. (*Id*. at 26). After Gonzalez left the island, EM Protective sent him an "invoice," wherein it deducted $2,000 from his total owed compensation as a penalty for his leaving Puerto Rico early. (Pl. Ex. 17). This invoice also states that EM Protective paid him $2,600. (*Id*.).

Gonzalez testified that he worked 12 hours a day while in Puerto Rico with no days off. (Pl. Ex. 39 B at 42, 49). There is no Form 1099 in the record for Hector Gonzalez. Gonzalez testified that he never received one. (*Id*. at 60). Due to inconsistencies in the record about how

---

Rico roster does not show the correct number of days that the employee was compensated for; or (3) the employee was not paid $400/day.

many days he worked, the Secretary estimated that Gonzalez worked from October 5, 2017, through October 18, 2017. (Pl. Ex. 1).

For Gonzalez, the Secretary calculated his daily rate at $400, which is the amount that EM stated that they were paying workers in Puerto Rico. For his first workweek, Gonzalez was paid $1,500 for four days. (*See* Pl. Ex. 1 at DOL 00758). This is the $1,500 in cash that he testified to being paid while he was in Puerto Rico. Since he worked four days, he should have been paid, $1,600, based upon the agreed-upon $400/day rate that EM Protective had promised. This underpayment resulted in a short-fall of $100 from the straight-time he was supposed to be paid. The Secretary can seek this underpayment because it occurred in an overtime workweek. *See* 29 C.F.R. § 778.107. If employers were permitted to deduct penalties from employees' wages in overtime weeks, that would, necessarily, undermine Section 7's requirement that an employee receive time and a half their regular rate for overtime. The Secretary also calculated that he was owed an additional $133.33 in half-time for overtime. (*See* Pl. Ex 1 at 758).

For his second workweek, Gonzalez was paid $2,600. This payment is the money that EM included with the "invoice." (Pl. Ex. 17). Gonzalez should have been paid $2,800 for this workweek – 7 days x $400/day. This resulted in a shortfall of $200 in straight time. In addition, Gonzalez was owed $733.33 for half-time payments on the 44 hours of overtime that he worked in this second workweek. (*See* Pl. Ex. 1 at 758).

For his last week at EM Protective, Gonzalez worked three days and was paid nothing – the previous payments by EM Protective covered his wages for the initial two workweeks. This violated the FLSA's minimum-wage provision. 29 U.S.C. § 206(a)(1)(C). Since this was a non-overtime workweek, the Secretary can only enforce the federal minimum wage of $7.25/hour. *See, e.g., United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir. 1960). As

such, Mr. Gonzalez is owed $261 in minimum wage back wages for working 36 hours ($7.25/hour x 36 hours = $261) and nothing in additional half-time because he worked fewer than 40 hours.

### 3. Total Back Wages

Based on the foregoing, the Secretary calculated $257,833.81 in overtime damages attributable to workers in Puerto Rico and $261 in minimum wage damages. The Court finds that the Secretary's calculations are reasonable and justified by the evidence of record. As such, this is the amount owed in back wages for the workers in Puerto Rico.

## D. Liquidated Damages

The FLSA provides that an employer found to have violated its provisions "shall be liable" to the affected employees "in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Liquidated damages are "compensation, not a penalty or punishment." *McClanahan v. Mathews*, 440 F.2d 320, 322–23 (6th Cir. 1971) (quoting *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583 (1942)).

The FLSA gives courts the discretion to decline to award liquidated damages "if the employer shows to the satisfaction of the court that the act or omission ... was in good faith and that [the employer] had reasonable grounds for believing that [its] act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260; *Martin v. Ind. Mich. Power Co*., 381 F.3d 574 (6th Cir. 2004). Courts may decline to award liquidated damages in exceptional circumstances "if, and only if, the employer shows that he acted in good faith and that he had reasonable grounds for believing that he was not violating the Act." *Dole v. Elliot Travel & Tours*, 942 F.2d 962, 967

(6th Cir. 1991) (quoting *Marshall v. Brunner*, 668 F.2d 748, 753 (3rd Cir. 1982) (emphasis in original)).

To prove that it acted in good faith, an employer "must show that [it] took affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions." *See Sec'y of Labor v. Timberline South, LLC,* 925 F.3d 838, 856 (6th Cir. 2019) (citing *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 584-85 (6th Cir. 2004)).

"[The]burden on the employer is substantial and requires 'proof that [the employer's] failure to obey the statute was *both* in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon [it] more than a compensatory verdict.'" *Elwell v. Univ. Hosp. Home Care Servs*., 276 F.3d 832, 840 (6th Cir. 2002). "Establishing that the employer did not willfully misclassify an employee is insufficient to show good faith." *Timberline*, 925 F.3d at 856 (citing *Elwell*, 276 F.3d at 841 n.5). Rather, employers have "an affirmative duty to ascertain and meet the FLSA's requirements, and an employer who negligently misclassifies an employee as exempt is not acting in good faith." *Id*.

As evidence that the classification of workers as independent contractors was in good faith, Defendants point to Maasikas' testimony that the decision was based on his experience working as an off-duty police officer during which he and his co-workers were classified an independent contractors. (Vol. II at 132-33). He testified that between 2010, when he established the business, and 2017, when he was contacted by the Department of Labor, no one questioned the classification. Defendant also point to testimony by EM's accountant, Steven Brown, who also performed accounting services for several of EM's workers, that none of these workers questioned their classification and that they took advantage of tax deductions available to independent contractors. (Vol. IV at 23).

31

Defendants have not presented sufficient evidence to meet their substantial burden to prove both good faith and reasonable grounds for the incorrect classification. Maasikas was unequivocal in his testimony – he did not take any affirmative steps to ascertain the FLSA's requirements prior to classifying the workers as independent contractors; he considered no factors and consulted no professionals. (Vol. II at 17-18 (stating that he did not consult any professionals or consider any factors regarding worker classification)).

The Court finds an equal amount of liquidated damages is appropriate for the workers in Puerto Rico in the amount of $258,094.81. The Court also finds that liquidated damages are appropriate for the local workers in an amount to be determined at a later date.

## E. Willfulness

If an employer 'willfully' violates the FLSA, the statute of limitations is three years. 29 U.S.C. § 255(a). If the violation is not willful, then the limitations period is two years. [find a new case] *Id*. Violations are willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985). An employer who acts unreasonably or negligently in violation of the FLSA does not act willfully. *Elwell v. Univ. Hosp. Home Care Svcs.*, 276 F.3d 832, 842 n.5 (6th Cir. 2002).

Notice of the FLSA requirements by virtue of prior violations and assurances of future compliance is highly indicative of willfulness. *Walsh v. KDE Equine, LLC*, 56 F.4th 409, 416 (6th Cir. 2022). Courts have found willfulness most frequently in situations in which the employer deliberately chose to avoid researching the law's terms or affirmatively evaded them. *Hoffman v. Prof. Med Team*, 394 F.3d 414, 419 (6th Cir. 2005) (citing *Alvarez v. IBP, Inc.*, 339 F.3d 894, 909 (9th Cir. 2003)). Court have also considered destruction, falsification, and

withholding of required records as evidence of willfulness. *See Martin v. Deiriggi*, 985 F.2d 129, 136 (4th Cir. 1992); *Elwell*, 276 F.3d at 844. The burden of proving an employer's willfulness falls on the plaintiff. *See Stansbury v. Faulkner*, 443 F. Supp. 3d 918, 935 (W.D. Tenn. 2020); *Schneider v. City of Springfield*, 102 F. Supp. 2d 827, 835 (S.D. Ohio 1999).

The Secretary argues Defendants' violations of the FLSA are willful, therefore the three-year statute of limitations applies. In this case, all of the damages at issue for the Puerto Rico workers are within the two-year statute of limitations. A finding of willfulness will only affect the damages owed to the Local Workers.

The Secretary points to two indications that Defendants' violations were willful. First, that Maasikas' belief that everyone who worked for him, from the Chief Operations Officer down, could be classified as an independent contractor was objectively unreasonable and demonstrated no effort to comply with the law. Second, the Secretary argues that EM's response to the investigation indicates that Defendants knew they would be found in violation of the law. The Secretary points to evidence that during the investigation EM misrepresented the number of workers it had in Puerto Rico, delayed responding to the investigator's requests for documents, and when it did respond, failed to provide all of the documents requested. Finally, the Secretary adds that EM failed to change its pay practices after the Department of Labor informed it in August 2018 of its finding that it needed to pay overtime.

Maasikas stated that he did not willfully violate the FLSA and that no one had ever suggested that EM's workers were misclassified as independent contractors. He does not dispute that he did not consult any professionals regarding the classification decision. Instead, he decided to pay the workers as independent contractors because that is how he had been classified when he performed similar work while employed as a police officer. (Vol. II at 132-33).

Defendants note that EM used the services of a certified public accountant, Steven Brown, and had been the subject of an IRS audit. Neither Brown nor the IRS suggested the workers might be misclassified. In fact, Brown testified that he provides services to other similar companies that classify their workers as independent contractors. (Vol. IV at 23). Brown noted that the IRS found no violations in connection with the general audit and could have, but did not, expand the audit to include an "Independent Contractor Audit." (*Id*. at 32-33). Brown added that he prepares taxes for several EM workers and that, as independent contractors, some of the workers take tax deductions for equipment they used in connection with their work for EM, including security lights, firearms, and traffic-related equipment. (*Id*.). Finally, Defendants argue that the lack of records should not be considered evidence of willfulness because, at least with regard to the Local Workers, there were time records (Pl. Ex. 10), timesheets (Pl. Ex. 11), and 1099 statements for each of the workers (Pl. Exs. 4, 5, 6).

The Court finds Defendants violation of the FLSA does not rise to the level of willfulness. Unlike other cases where courts have found willfulness, here Defendants had not previously been the subject of complaints or investigation and were not clearly on notice that their conduct violated the FLSA. Until the investigation that precipitated this case, there is no evidence that EM's accountant or anyone else raised the issue of worker classification or suggested that its workers ought to receive overtime pay. Although withholding of records can constitute evidence of willfulness, the conduct in this case does not come anywhere near the level of that in *Martin v. Deiriggi*, 985 F.2d 129, 136 (4th Cir. 1992), in which the defendant destroyed records and ordered employees to lie to investigators about hours worked. To be sure, Maasikas negligently relied on his own experience and alleged industry norms, kept subpar

records, and did not consult any experts to ascertain the compliance obligations under the FLSA. However, negligence does not equate to willfulness.

The Secretary has not established that Defendants willfully violated the FLSA. Accordingly, the two-year statute of limitation applies.

## F. Injunction

The Secretary seeks a prospective injunction requiring future compliance with the FLSA. The Sixth Circuit has noted that the issuance of such an order lies within the sound discretion of the trial court. *Brennan v. Westinghouse Credit Corp.*, 509 F.2d 81 (6th Cir. 1975). The purpose of a prospective injunction is to protect the public interest in insuring against substandard wages, not to punish an employer. *Wirtz v. Flame Coal*, 321 F.2d 558, 560-61 (6th Cir. 1963). In cases where there has been a clear violation of the Act, an injunction should be issued in the absence of affirmative evidence that the employer will voluntarily comply with the Act. *Id*. at 560.

As set forth above, EM and Maasikas have failed to comply with the FLSA. There is nothing in the record to show Defendants will voluntarily comply. Accordingly, the Court finds that an injunction from this Court is appropriate. The injunction will issue by separate order.

## IV.     CONCLUSION

For the reasons stated above, the Court concludes that: (1) The Local Workers are employees and EM Protective Services LLC is an employer within the meaning of the FLSA; (2) Defendants violated the record keeping requirements of Section 11(c) of the FLSA, 29 U.S.C. § 211(c); (3) Defendants are liable for back wages for the Puerto Rico Workers in the amount of $257,833.81 in overtime damages and $261 in minimum wage damages; (4) Defendants are liable for liquidated damages in an amount equal to the total overtime and minimum wage damages, including an amount to be determined with regard to the Local Workers at a future

date; (5) Defendants' violation of the FLSA was not willful; and (6) a prospective injunction will enter.

An appropriate order will enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE